*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0005P (6th Cir.)
File Name: 04a0005p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED RENTALS (NORTH AMERICA), INC.,
    *Plaintiff-Appellant,*

v.

JERRY KEIZER, GRANT RENT-ALL, INC. and MULDER'S OUTDOOR POWER EQUIPMENT, INC.,
    *Defendants-Appellees.*

No. 02-1580

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 00-00831—Douglas W. Hillman, District Judge.

Argued: October 28, 2003

Decided and Filed: January 7, 2004

Before: CLAY and COOK, Circuit Judges; STAFFORD, District Judge.[*]

---

[*] The Honorable William Stafford, United States District Judge for the Northern District of Florida, sitting by designation.

---

### COUNSEL

**ARGUED:** Robert H. Smeltzer, LOWIS & GELLEN, Chicago, Illinois, for Appellant. Steven C. Berry, BIGLER, BERRY, JOHNSTON, SZTYKIEL & HUNT, Zeeland, Michigan, for Appellees. **ON BRIEF:** Robert H. Smeltzer, Gerald Haberkorn, LOWIS & GELLEN, Chicago, Illinois, Harold E. Nelson, BORRE, PETERSON, FOWLER & REENS, Grand Rapids, Michigan, for Appellant. Steven C. Berry, BIGLER, BERRY, JOHNSTON, SZTYKIEL & HUNT, Zeeland, Michigan, Robert W. Smith, SILVERMAN, SMITH, BINGEN & RICE, Kalamazoo, Michigan, for Appellees.

CLAY, J., delivered the opinion of the court, in which COOK, J., joined. STAFFORD, D. J. (pp. 27-28), delivered a separate opinion concurring in part and dissenting in part.

---

### OPINION

---

CLAY, Circuit Judge. Plaintiff United Rentals (North America), Inc. appeals from the April 5, 2002, district court order granting summary judgment to Defendants Jerry Keizer, Grant Rent-All, Inc. and Mulder's Outdoor Power Equipment, Inc. on Plaintiff's claims for breach of contract; violation of the Michigan Uniform Trade Secrets Act, Mich. Comp. Laws Ann. § 445.1902; intentional interference with contract; intentional interference with business relations; civil conspiracy; and breach of a fiduciary duty of loyalty. The Court **AFFIRMS** the district court's order.

# I.
## STATEMENT OF FACTS

### A.   Procedural History

On November 7, 2000, United Rentals (North America), Inc. ("United") filed a complaint against Defendants Jerry Keizer, Grant Rent-All, Inc. and Mulder's Outdoor Power Equipment, Inc. ("Mulder's").   Since the parties are completely diverse and the amount in controversy exceeds $75,000, the district court had subject matter jurisdiction over the matter.

The complaint alleged that Keizer violated his covenant-not-to-compete set forth in ¶ 7.2 of his employment agreement by selling construction equipment and soliciting United's customers in a proscribed geographic area, the so-called "Target Area."   The complaint further alleged that Keizer, Grant Rent-All and Mulder's continue to compete with United in the Target Area and do so with United's proprietary information in violation of ¶ 7.3 of the agreement and the Michigan Uniform Trade Secrets Act. The complaint also alleged a claim for tortious interference with business relations – i.e., Defendants allegedly interfered with the business relationship between United and its customers; a claim that Mulder's tortiously interfered with Keizer's obligations under the employment agreement; and a civil conspiracy by all Defendants to breach the restrictive covenants of the employment agreement, interfere with United's business relations; misappropriate United's confidential information; and to improperly solicit and do business with United's customers.

United sought an injunction against Keizer and Grant Rent-All (and Mulder's, to the extent it is doing business with Keizer or Grant Rent-All) from competing with United in the Target Area for a specified period of time, disclosing United's confidential information and soliciting United's customers in the Target Area for a specified period of time.   United also

sought to affirmatively compel Defendants to locate and return any and all of United's confidential information. The complaint also sought an accounting from Defendants for Keizer's alleged breach of the employment agreement and an award of actual and punitive damages. On August 24, 2001, United filed an amended complaint adding a claim against Keizer for breach of a fiduciary duty of loyalty.

Defendants Keizer and Grant Rent-All answered the complaint, and Keizer filed a counter-claim against United on February 21, 2001, alleging that United breached the employment agreement by terminating him without prior notice and without cause on March 6, 2000; Keizer sought his unpaid salary under the agreement from March 6, 2000 through May 31, 2003. Defendant Mulder's answered the complaint on August 13, 2001. United filed an answer to the counterclaim on March 31, 2001. Keizer and Grant Rent-All filed an answer and counterclaim to the amended complaint on September 13, 2001.

On November 1, 2001, Keizer and Grant Rent-All moved for summary judgment on United's complaint.   On November 2, 2001, United moved for summary judgment on Count I of its complaint for breach of the non-competition and non-solicitation provision of the employment agreement and on Keizer's counterclaim.

On April 5, 2002, the district court granted Keizer and Grant Rent-All's summary judgment motion, denied United's motion for summary judgment on Count I, and granted United's summary judgment motion on Keizer's counterclaim.   The district court also entered judgment in favor of Mulder's on all counts in United's complaint, even though Mulder's had not moved for summary judgment.

For the district court, the crux of the dispute boiled down to the interpretation of the prohibition in ¶ 7.2 of Keizer's employment agreement which, *inter alia,* prohibits Keizer from "directly or indirectly … engag[ing] in the operation of

any equipment sale, rental or leasing business" in the Target Area, excluding Newaygo County. The district court held that this language prohibited Keizer from operating such a business only if it is physically located within the Target Area. Accordingly, Keizer did not breach the agreement by operating Grant Rent-All, which is physically located in Newaygo County, but nevertheless does one-third of its business with customers inside the Target Area. Assuming *arguendo* that the above-quoted language from ¶ 7.2 is ambiguous, the district court further held that there was no parol evidence in the record to support United's contrary interpretation of the agreement.

The district court dismissed United's claim for breach of the confidentiality clause (¶ 7.3 of the agreement) because United had failed to submit any evidence showing that Keizer had taken or used any confidential information, as defined by the agreement. The district court also dismissed United's claim under the Michigan Uniform Trade Secrets Act. The district court dismissed the tortious interference with business relations, tortious interference with contract and civil conspiracy claims because there was no evidence that Defendants had wrongfully interfered with United's business. Last, the district court dismissed the breach of fiduciary duty of loyalty claim because there is no evidence that Keizer did not devote his full efforts to United's business.

United filed its notice of appeal on May 3, 2002. Keizer did not appeal the district court's dismissal of his counterclaim against United.

## B.  Substantive Facts

United is a Delaware corporation with its principal place of business in Greenwich, Connecticut. United is in the business of renting and selling construction and industrial equipment throughout the United States. United purchased all of the stock of Kubota of Grand Rapids, Inc. ("KGR") on June 9, 1998. KGR was then merged into United. United is in the

business of renting and selling construction and industrial equipment in the Western Michigan area.

Jerry Keizer is a Michigan resident, a former owner of KGR and former general sales manager of United/KGR. Grant Rent-All is a Michigan corporation, with its principal place of business in Grant, Michigan, which is within Newaygo County. Keizer has been the owner and president of Grant Rent-All since December 1994. Keizer never worked at Grant Rent-All until May 2000. Grant Rent-All is managed by Keizer's step-son and step-son-in-law.

Mulder's Outdoor Power Equipment, Inc. ("Mulder's") is a Michigan corporation, with its principal place of business in Byron Center, Michigan; it is in the business of renting and selling construction and industrial equipment. Jerry Keizer's brother, Ron Keizer, is employed by Mulder's.

Prior to June 1, 1998, Jerry Keizer owned one-third of KGR's stock. The other two-thirds were owned by Grand Valley Investments, LLC ("GVI"), a limited liability company consisting of the four Grasman brothers (Larry, Jack, Russ and Rick.) GVI also fully owned and operated an equipment business in Hudsonville known as Grand Valley Equipment Company, Inc. ("GVEC"); Keizer had no interest in GVEC. KGR is located in Grand Rapids, Michigan and is in the business of selling construction, farm and landscaping equipment such as tractors and commercial mowers.

In April 1998, United approached GVI with a letter of intent to purchase the stock of both KGR and GVEC for $22,750,000. United's letter did not acknowledge the fact that Keizer owned a significant amount of KGR stock; among other things, the letter proposed that at closing, United would enter into employment agreements with the four Grasman brothers and that the Grasman brothers would enter into a five-year non-compete agreement, but there was no reference to Keizer.

GVI, by contrast, clearly was aware that it did not own all of the KGR stock and that in order for the proposed sale with United to proceed, GVI needed to control all KGR stock. Accordingly, GVI forwarded a copy of United's letter of intent to Keizer, along with a proposed stock option agreement through which GVI would buy Keizer's stock in KGR. The stock option agreement recited that Keizer owned 7,250 KGR shares compared to GVI's 14,500. It further acknowledged that United had approached GVI about purchasing all of GVEC's stock and that the KGR shares would be included in the proposed transaction.

For $5,000, Keizer granted GVI an option to purchase his KGR shares for $1,475,000. Keizer agreed that if GVI exercised the option, Keizer would "enter into an agreement not to compete with KGR or GVEC for five years (other than in Newaygo County) and otherwise in form and substance acceptable to [United], for which KGR shall pay Keizer" $25,000. Further, upon exercising the option, KGR would enter into a five-year employment agreement with Keizer that could be terminated only for just cause.

At this time, GVI also was aware that Keizer owned or partially owned Grant Rent-All, a competing equipment sale and rental business in Newaygo County. GVI also was aware that Grant Rent-All had sold equipment to customers in the Grand Rapids area, outside of Newaygo County. It is undisputed that over one-third of Grant Rent-All's customers were located outside Newaygo County both before and after the sale of KGR stock to United.

According to Keizer, the Stock Option Agreement mentioned that Newaygo County would be excluded from the non-competition agreement because Keizer had so requested at a meeting with the Grasmans and their attorney, Stephen Kretschman, on April 29, 1998. Keizer wanted an assurance incorporated into the non-competition provision that if things did not work out with United as his new employer that he could "do business as usual in Newaygo" with Grant Rent-

All.[1] Keizer signed the modified stock option agreement later that day.

On May 20, 1998, Kretschman, the Grasmans' attorney, wrote United's attorney, John Arndts, about the anticipated employment agreement with Keizer. Kretschman's letter stated that he anticipated that Keizer's employment agreement would be "along the lines required of the Grasmans, but, in the case of the non-compete, excluding Newaygo County, where his son operates a competing business." (J.A. 173-74.) On May 26, Arndts wrote back with a form employment agreement for Jerry Keizer to sign. Arndts further stated, "[W]ith respect to excluding Newaygo County from the non-competition provisions of Jerry's agreement with [KGR], we need more information concerning what competitive activities are contemplated in Newaygo County by his son and Jerry." (J.A. 183.)

Thereafter, United made little effort to get any additional information regarding the competitive activities of Grant Rent-All. United asserts that its inquiries were limited because the Grasmans had informed it that Grant Rent-All was a business in which Keizer and his son or son-in-law were involved, but that it was a very small business with a different product line from the Grasmans and that it did business only in Newaygo County. United does not claim, however, that Keizer misled it about Grant Rent-All prior to purchasing KGR's and GVEC's stock. In fact, United never made any inquiries of Keizer about Grant Rent-All until months after Keizer had signed his employment agreement.

The final version of Keizer's employment agreement contained the non-competition provision with the Newaygo

---

[1]Keizer's testimony was corroborated by Richard, Russell and Terry Grasman. United cites to the affidavit of Larry Grasman, which states that his understanding of the non-competition agreement "was to allow Jerry Keizer to compete with United only in Newaygo County." (J.A. 1815.)

exclusion.     The Grasmans' attorney, Kretschman, had incorporated the exclusion into the form employment agreement that had been provided to him by United's attorney. Kretschman testified that he incorporated the Newaygo County exclusion into Keizer's employment agreement with KGR to "reflect the fact that there was a business in Newaygo County that would … otherwise fall within the scope of the non-compete that should be excluded from it." (J.A. 596). On June 1, 1998, Keizer sold his KGR stock to GVI. On the same day, he signed the employment agreement with KGR.

Paragraph 7.2 of the employment agreement contains the following non-competition and non-solicitation provisions:

> 7.2     Competition and Solicitation     For a period commencing on the Closing Date and terminating five (5) years thereafter (the "Restricted Period"), neither the Employee nor any of his Affiliates shall, anywhere in the Target Area, (as herein defined), directly or indirectly, acting individually or as the owner, shareholder, partner, or employee of any entity, (i) engage in the operation of any equipment sale, rental or leasing business; (ii) enter the employ of, or render any personal services to or for the benefit of, or assist in or facilitate the solicitation of any business engaged in such activities; or (iii) receive or purchase a financial interest in, make limitation, as a sole proprietor, partner, shareholder, officer, director, principal, agent trustee or lender, provided, however, that the Employee may own, directly or indirectly, solely as an investment, securities of any business traded on any national securities exchange or NASDAQ, provided the Employee is not a controlling person of, or a member of a group which controls such business and further provided that the Employee and his Affiliates do not, in the aggregate, directly or indirectly, own two percent (2%) or more of any class of securities of such business.  Employee and the

> Company agree that the sum of Twenty Five Thousand Dollars ($25,000) Price shall be paid by the Company to Employee in consideration of this covenant not to compete upon execution of this Agreement.  For purposes hereof, the term "Target Area" shall mean the area within the state of Michigan west of I-75 and U.S. Route 23, but shall exclude Newaygo County.

(J.A. 29, ¶ 7.2.)

Paragraph 7.3 of the employment agreement contains the following confidentiality provision:

> 7.3    Confidential Information   During the Restricted Period and thereafter, the Employee shall keep secret and retain in strictest confidence, and shall not use for the benefit of himself or others, all data and information relating to the Business ("Confidential Information"), including, without limitation, know-how, trade secrets, customer lists, supplier lists, details of contracts, pricing policies, operational methods, marketing plans or strategies, bidding information, practices, polices or procedures, product development techniques or plans, and technical processes; provided, however, that the term "Confidential Information" shall not include information that (i) is or becomes generally available to the public other than as a result of disclosure by the Employee, or (ii) is general knowledge in the equipment rental, sales or leasing business and not specifically related to the Business.

(J.A. 29, ¶ 7.3.)[2]

---

[2] The agreement is governed by Michigan law (¶ 9) and also contains an integration clause which reads:

> This Agreement contains the entire agreement of the parties and supersedes all prior or contemporaneous negotiations, correspondence, understandings and agreements between the

On June 9, 1998, United purchased from GVI all of the stock and assets of KGR and GVEC for $22,750,000. On October 1, 1999, KGR and GVEC merged with United.[3] In March 2002, United replaced Keizer as the general sales manager, although his salary and benefits continued per the employment agreement. Keizer resigned effective April 27, 2002, believing that his demotion from general sales manager was a constructive discharge.

United's complaint alleges that during the term of Keizer's employment, Keizer maintained an active interest in the affairs of Grant Rent-All, a competitor of United, and affirmatively misrepresented his interest in that business to United. Specifically, the complaint alleges that Keizer maintained his position as president of Grant Rent-All and actively obtained financing for its equipment purchases. When United asked Keizer about his interest in Grant Rent-All, Keizer allegedly said that it was his son's business, with which he had nothing to do.

United alleges that, after resigning from United, Keizer took a customer list and began surreptitiously competing with United in the Target Area under the aegis of Grant Rent-All. Specifically, United alleges that Keizer began selling equipment to United's customers within the Target Area;

---

parties, regarding the subject matter of this Agreement. This Agreement may not be amended or modified except in writing signed by both parties and supported by new consideration.

(J.A. 32, ¶ 12.)

[3] The employment agreement continued in force. The employment agreement provides that it cannot be terminated "by any voluntary or involuntary dissolution, reorganization, merger, consolidation or transfer of assets of the Company ..., if a surviving or resulting corporation or other entity or person continues ... the business of the Company." (J.A. 28, ¶ 6.6.) The agreement binds and "inure[s] to the benefit of the corporation or other entity" and provides that Keizer would be a general sales manager at that surviving entity. (J.A. 28, ¶ 6.6. )

offering equipment for sale to the general public within the Target Area both directly and through Mulder's; selling equipment at auctions within the Target Area; selling equipment and parts directly to United's competitors within the Target Area; advertising equipment for sale and/or rental within the Target Area; soliciting United's customers within the Target Area; marketing Grant Rent-All in a way that suggested it was affiliated with other business within the Target Area; and giving Mulder's a copy of KGR's customer list.

## II.
## ANALYSIS

### A. Standard of Review

This Court reviews *de novo* a district court's decision to grant summary judgment. *Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1048 (6th Cir. 2001). Summary judgment must be granted if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute over a material fact is only a "genuine issue" if a reasonable jury could find for the nonmoving party on that issue. *Cockrel,* 270 F.3d at 1048 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). In reviewing the district court's grant of summary judgment, this Court must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

A special interpretive framework applies when a court entertains a summary judgment motion in a breach of contract case:

> ... [A] contract can be interpreted by the court on summary judgment if (a) the contract's terms are clear, or (b) the evidence supports only one construction of

the controverted provision, notwithstanding some ambiguity.… If the court finds no ambiguity, it should proceed to interpret the contract – and it may do so at the summary judgment stage. If, however, the court discerns an ambiguity, the next step – involving an examination of extrinsic evidence – becomes essential.… Summary judgment may be appropriate even if ambiguity lurks as long as the extrinsic evidence presented to the court supports only one of the conflicting interpretations.

*Gencorp, Inc. v. Am. Int'l Underwriters,* 178 F.3d 804, 818 (6th Cir. 1999) (quoting *Torres Vargas v. Santiago Cummings,* 149 F.3d 29, 33 (1st Cir. 1998) (internal citations and quotations omitted by *Gencorp*)).

## B. The Plain Language of Defendant Keizer's Non-Competition Agreement

As noted above, Keizer entered into an employment agreement with United's predecessor, KGR. Paragraph 7.2 of the agreement contains a covenant not to compete; such covenants are enforceable under Michigan law. *See* Mich. Comp. Laws Ann. § 445.774a (a covenant that restricts an employee from engaging in employment or a line of business after termination of employment is enforceable "if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business"). The covenant reads, in relevant part, as follows:

[N]either [Keizer] nor any of his Affiliates shall, anywhere in the Target Area, (as herein defined), directly or indirectly, acting individually or as the owner, shareholder, partner, or employee of any entity … engage in the operation of any equipment sale, rental or leasing business.

The central question is: What does it mean to engage in operation of a competing business in the Target Area? United

argues that soliciting business from and selling to customers within the Target Area is tantamount to operating a business in the Target Area. Defendants argue that to operate a business in the Target Area the business must be physically located in the Target Area. In this Court's view, Defendants are correct.

As the district court noted, "When ordinary speakers refer to where a *business is operated,* they refer to the location of the business.… For example, a retail store in Grand Rapids would not be said to operate in Newaygo County simply because a customer drives from Newaygo to purchase an item at the Grand Rapids store, even if the store actively advertised in Newaygo." (J.A. 70) (emphasis in original). Indeed, this proposition becomes clearer with a more extreme example. If Keizer were to relocate Grant Rent-All to the North Pole (e.g., the warehouse, inventory and employees), send direct mailings and make telephone calls to potential customers in the Target Area and then personally deliver the goods, the common sense understanding of this set-up would be that Keizer *operates* his business in the North Pole, even though he sells to customers in the Target Area. *Cf. Bianchi v. Auto. Club of Mich.,* 467 N.W.2d 17, 20 (Mich. 1991) (holding that "common sense" is a proper basis for contract interpretation). *See also Lozada v. Dale Baker Oldsmobile, Inc.,* 197 F.R.D. 321, 339 (W.D. Mich. 2000) ("When the contract terms are plain and unambiguous, a court will construe the contract as it is written and presume the parties' intent is consistent with the ordinary meaning of the terms in the contract.") (citing *Pierson Sand & Gravel, Inc. v. Pierson Township,* 851 F. Supp. 850 (W.D. Mich.1994)); *Britton v. John Hancock Mut. Life Ins. Co.,* 186 N.W.2d 781, 782 (Mich. Ct. App. 1971) ("Contracts which are unambiguous are not open to construction and must be enforced as written.") (citations omitted).

United cites to a dictionary that defines "operation" as "a process or series of acts aimed at producing a desired result or effect; a method or process of productive activity."

*Appellant's Reply Br.* at 5 (quoting *Webster's II, New College Dictionary* (1995)). United argues that the phrase "engage in the operation of" in ¶ 7.2 is equivalent to "engage in a series of acts," such that Keizer's acts of selling to customers in the Target Area amounted to his engagement in a series of prohibited acts in the Target Area. This Court has discovered, however, that, *with specific regard to a business*, dictionaries define operation to mean "a business activity or enterprise." *Oxford English Dictionary Online Edition* (from the second print ed. 1989). The word "operate" is defined as "[t]o direct the working of; to manage, conduct, work (a railway, business, etc.)" *Id. See also Webster's Third New Int'l Dictionary* 1581 (1993) ("to manage and put or keep in operation whether with personal effort or not <*operated* a grocery store>"). Taken together, these definitions strongly indicate that in the business context an operation requires a discrete physical location, such as a railway or a grocery store. But even assuming that an operation can transcend a particular physical location, the definition of "operate" indicates that management or oversight is an essential element of a business operation. Here, there is no evidence that Keizer has managed a competing enterprise in the Target Area. Although Keizer allegedly carried out some sales and deliveries in the Target Area, these transactions did not involve management or oversight of Grant Rent-All's business.

United cites several cases that purportedly support its plain meaning interpretation of the covenant-not-to-compete. On the surface, the strongest case United cites is *Collen v. Source EDP, Texas, Inc.,* 576 S.W.2d 435 (Tex. Civ. App. 1978). In that case, William Collen had agreed to a restrictive covenant which stated that he would not "directly or indirectly, enter into or be engaged as a sole proprietor, partner, stockholder, or employee in any personnel placement business in the City of Dallas, and within a 100-mile radius thereof." *Id.* at 435-36. Collen argued that the covenant restrained him only from physically establishing a business in the proscribed area, and therefore, he was not prohibited from working for a company whose office is located outside of that area, but soliciting personnel placement business in Dallas. *Id.* at 436. In affirming the lower court's enforcement of the covenant against Collen, the Texas court engaged in little analysis, instead merely summarizing the facts and holdings of two cases – *Foxworth-Galbraith Lumber Co. v. Turner*, 46 S.W.2d 663 (Tex. Comm'n App. 1932) and *Hartung v. Hilda Miller, Inc.,* 133 F.2d 401 (D.C. Cir. 1943). *See Id.* at 436.

This Court does not find *Collen* to be persuasive authority for two reasons. First, the Texas court appeared to flout the plain language of the restrictive covenant, which, on its face, limited Collen only from working for a personnel placement business "in" (i.e., physically located within) a defined area. Collen abided by the plain terms of the covenant, and it is inexplicable why the court read the covenant expansively to include working for such a business located outside of the defined area. Second, *Collen* was decided under Texas law, not Michigan law, which commands the courts to narrowly construe restrictive covenants. *See Kelsey-Hayes Co. v. Maleki,* 765 F. Supp. 402, 406 (noting that the Michigan Uniform Trade Secrets Act "does not remove such covenants from disfavored status, and narrowly limits them to 'reasonableness' in protecting only a competitive interest, duration, geographic area, and type of employment"), *vacated after settlement,* 889 F. Supp. 1583 (E.D. Mich. 1991).

The two decisions relied upon by the *Collen* court in no way advance United's argument herein. In *Foxworth-Galbraith*, the covenant restricted sales ("the business of selling") in Littlefield, Texas or within ten miles thereof. *Foxworth-Galbraith*, 46 S.W.2d at 663. Keizer's covenant, in contrast, restricts the "operation of any … business" in the Target Area. Had the drafters of Keizer's covenant intended to restrict sales or deliveries in the Target Area and not just the presence of a business in that area, they easily could have specified a sales limitation in the covenant. They did not. In fact, it was because the covenant in *Foxworth-Galbraith* additionally restricted shipments into the defined areas that

the Texas court enforced the covenant against the defendants. The court suggested that without this specific restriction, the defendants' conduct would have fallen outside of the more general prohibition against engaging in the business of selling in those areas. *See id.* at 666 (holding that the specific restriction on deliveries into Littlefield "was designed to prohibit sales which might not come strictly within the terms of the former provisions, and to prevent an evasion of such provisions").

United's reliance on the Alabama court's decision in *Dixon v. Royal Cup, Inc.,* 386 So. 2d 481 (Ala. Civ. App. 1980), is misplaced for the same reasons. In *Dixon,* a salesman agreed not to "engage in the business of selling" particular items within a defined geographic area. *Id.* at 481-82. He specifically agreed not to "solicit or take orders for or sell or deliver any such merchandise" in that area. *Id.* at 482. Again, Keizer agreed to no such specific geographic restrictions on selling construction equipment. Unlike the drafters of the agreement in *Dixon,* the drafters of Keizer's employment agreement could have specified a prohibition on soliciting orders from or delivering merchandise to customers in the Target Area, but did not.

If anything, the *Dixon* case undermines United's argument. The Alabama court noted that "engaging in business, as used in a restrictive covenant in an employment contract, involves not only the servicing or soliciting of customers, *but also means the setting up of an office or place of business for soliciting or servicing customers*." *Id.* at 483 (emphasis added) (citing *R.E. Harrington, Inc. v. Frick,* 428 S.W.2d 945 (Mo. Ct. App. 1968)). Assuming *arguendo* that the phrase "engage in business" is linguistically equivalent to "engage in the operation of … any business," on the facts of this case, it is undisputed that Keizer did not set up an office in the Target Area. Accordingly, under *Dixon,* Keizer did not run afoul of the restrictive covenant because he did not engage in business in the Target Area.

The second decision cited by the Texas Court of Appeals in *Collen* also does not support United's plain language argument. In *Hartung*, the sellers gave the buyers the exclusive right to use the name Hilda Miller, Inc. The sellers further agreed not to "engage in the furniture business under [that name] nor any other name within the District of Columbia." *Hartung,* 133 F.2d at 401. The sellers opened up a competing furniture business under the Hilda Miller name in a nearby Maryland suburb, advertised the business in District of Columbia newspapers and sold to District of Columbia residents. *Id.* at 401-02. Although the court enforced the covenant as to the sellers' use of the Hilda Miller name, the court *refused*, on vagueness grounds, to enforce the more general prohibition against engaging in the furniture business in the District of Columbia. *Id.* at 402. Since there is no allegation in this case that Keizer co-opted the United name, it is difficult to see how *Hartung* is relevant. Regardless, the language of the *Hartung* covenant focused on engaging in the furniture business (i.e., sales) within the District of Columbia, unlike Keizer's covenant which focuses on the situs of the operation from which sales emanate.[4]

Even assuming that United's broad interpretation of operating a business is plausible, any ambiguity in the language, which was crafted by United's predecessor in interest, must be construed against United and in favor of Keizer. *See Higgins v. Lawrence,* 309 N.W.2d 194, 196 (Mich. Ct. App. 1981) ("It is well settled in the law of contracts that language will be construed against the party drafting the instrument.") (citations omitted); *see also De Bruyn Produce Co. v. Romero,* 508 N.W.2d 150, 156 n.4 (Mich. Ct. App. 1993) ("an ambiguous document must be construed against the drafter of the document"). It is

---

[4] One other case United cites is inapposite because the covenant language was far broader than the language in Keizer's contract. In *Sobers v. Shannon Optical Co.,* 473 A.2d 1035, 1038 (Pa. Super. Ct. 1984), the defendants had agreed to "not compete" with the plaintiff.

undisputed that United drafted the form employment agreement; ¶ 7.2 was then modified by its predecessor-in-interest to the contract (GVI). Under ¶ 6.6 of the employment agreement, United succeeded to GVI's rights and obligations under the agreement. Accordingly, United stands in the same position as GVI relative to Keizer with regard to how the agreement must be interpreted. Just as ¶ 7.2 would have to be construed against GVI, as the drafter, so too must it now be construed against United, as GVI's successor. For this reason as well, the district court was correct in holding that Keizer did not breach ¶ 7.2 of the employment agreement by operating a business located outside of the Target Area, but that conducts business inside the Target Area.

## C.   The Extrinsic Evidence

Assuming *arguendo* that the operative language from ¶ 7.2 is ambiguous, the Court can look to parol evidence to construe it as long as that evidence is not inconsistent with the written words. *See Ditzik v. Schaffer Lumber Co.,* 360 N.W.2d 876, 880 (Mich. Ct. App. 1984) ("The 'parol evidence rule' operates to exclude evidence of prior contemporaneous agreements, whether oral or written, which contradict, vary or modify an unambiguous writing intended as a final and complete expression of the agreement."); *Detroit Bank & Trust Co. v. Coopes,* 287 N.W.2d 266, 269 (Mich. Ct. App. 1979) (noting that the test for the admissibility of parol evidence "is whether the proffered parol evidence is inconsistent with the written language") (internal quotation marks and citations omitted). When interpreting an ambiguous contract with extrinsic evidence, summary judgment is proper so long as the "extrinsic evidence presented to the court supports only one of the conflicting interpretations." *Gencorp,* 178 F.3d at 818. As discussed below, the extrinsic evidence supports only one interpretation of the agreement, that of Keizer's.

It is undisputed that United (via GVI) was aware of Keizer's ownership interest and personal involvement in

Grant Rent-All before entering into the employment agreement. During negotiations, United's attorney was explicitly advised that ¶ 7.2 would have to exclude Newaygo County from the non-compete because Keizer's "son operates a competing business" in that county. (J.A. 74.) United had the opportunity to conduct due diligence on the extent to which Grant Rent-All competes with United, but chose to rely on the verbal assurance of a GVI representative that Grant Rent-All was not a competitor. United never corroborated this assurance by requesting written substantiation or by speaking with Keizer. Had United requested documentation, it would have discovered that one-third of Grant Rent-All's customers were located in the Target Area and that Grant Rent-All sells similar products. Thus, on this factual record, there is no evidence that the parties meant to curtail Grant Rent All's business in any fashion. Indeed, the negotiation history shows that the Newaygo County exclusion was meant to protect Keizer's interest in that business. Thus, the extrinsic evidence shows that the parties intended to restrict Keizer's ability to compete by limiting the location of the business which he might operate.

United counters that the most important piece of extrinsic evidence is Keizer's stock option agreement with GVI. There, Keizer agreed that he would "enter into an agreement *not to compete* with KGR or GVEC for five years (other than in Newaygo County) and otherwise in form and substance acceptable to [United], for which KGR shall pay Keizer" $25,000. (J.A. 171.) (emphasis added). United argues that the stock option agreement shows that the parties intended to preclude Keizer from *competing* with United anywhere except within Newaygo County. *Appellant's Br.* at 34.

United's argument is not persuasive. This language merely labels the *type* of agreement to which Keizer would later agree – an agreement not to compete; it does not even begin to define the *scope* of that agreement. As the instant dispute shows, a non-competition provision can be narrow or broad,

depending on the specific language of the agreement.[5]  Thus, the stock option agreement does not create a disputed issue of fact about the meaning of ¶ 7.2.  Moreover, even assuming that the stock option agreement somehow obligated Keizer not to compete with United in the Target Area, as discussed above, the other evidence shows that ¶ 7.2 of the employment agreement creates no such obligation.  Accordingly, the employment agreement dictates Keizer's non-competition obligations, not the earlier-signed stock option agreement.  *See CMI Int'l, Inc. v. Intermet Int'l Corp.,* 649 N.W.2d 808, 812 (Mich. Ct. App. 2002) ("When two agreements cover the same subject matter and include inconsistent terms, the later agreement supersedes the earlier agreement.") (citation omitted).

#### D.  Defendant Keizer's and Grant-All's Alleged Breach of Keizer's Employment Agreement

United argues that Keizer has violated the non-competition provision, even accepting the district court's interpretation of ¶ 7.2.  United cites to evidence that Keizer has been doing business with Mulder's and Grand Equipment Company, competitors located in the Target Area.  *Appellant's Br.* at 13.  In the Target Area, Keizer has sold equipment at auctions, placed two or three pieces of used equipment on a vacant lot

---

[5]United also cites as parol evidence the affidavit of Larry Grasman, a principal of GVI, who stated that his understanding of the non-competition agreement "was to allow Jerry Keizer to compete with United only in Newaygo County." (J.A. 1815.)  In contrast, the other three principals of GVI, Richard, Russell and Terry Grasman, corroborated Keizer's interpretation of ¶ 7.2 – namely, that the provision was intended to permit Grant Rent-All to operate as it always had been.  Larry Grasman's testimony does not create a genuine issue of material fact on the meaning of ¶ 7.2, in light of the overwhelming parol evidence which supports Keizer's interpretation.  Specifically, both GVI and United were aware of Keizer's involvement with Grant-All, and United was on notice that Grant-All was a competitor.  Despite this knowledge, United and GVI did not draft ¶ 7.2 with language that explicitly precludes Keizer from selling in the Target Area.

with a "for sale" sign, attended a trade show, advertised his business, solicited customers through mass mailings and placed a few pieces of equipment for sale or rental at Mulder's. *Id.* at 13-14.  This evidence, however, shows only that Keizer has done some business (i.e., selling or renting equipment) in the Target Area, not that he has operated a business located in the Target Area.

In addition, United has not articulated a basis for holding Grant Rent-All liable for breaching a contract to which it was not a signatory, namely, Keizer's employment agreement.  Since Grant Rent-All was not a party to the agreement, summary judgment on the breach of contract claim was proper for Grant Rent-All on this independent ground.

#### E.  Defendant Mulder's Alleged Violation of the Michigan Uniform Trade Secrets Act.

United has not pressed its contract- and statutorily-based breach of confidentiality claims against Keizer and Grant-All.  Accordingly, United has waived any challenge to the district court's dismissal of Count II (Michigan Uniform Trade Secrets Act) with respect to Keizer and Grant Rent-All and the portion of Count I which claims Keizer and Grant Rent-All breached the confidentiality provisions of the employment agreement.  Instead, United takes issue with the district court's *sua sponte* entry of summary judgment in favor of Mulder's on United's claim under the Michigan Uniform Trade Secrets Act. ("MUTSA").  Although we agree with our dissenting colleague that the district court should have afforded United ten days' advance notice and an opportunity to respond, *Yashon v. Gregory,* 737 F.2d 547, 552 (6th Cir. 1984), we believe that the court's violation of Rule 56 was non-prejudicial. *Kistner v. Califano,* 579 F.2d 1004, 1006 (6th Cir. 1978) (holding that noncompliance with Rule 56's ten-day notice requirement does not deprive the court of the authority to grant summary judgment when "there has been no prejudice to the opposing party by the court's failure to comply with this provision of the rule").  On appeal, United

has proffered whatever evidence and related argument it can muster in opposition to summary judgment on the MUTSA claim against Mulder's.   United has not argued that it was denied critical discovery, thereby hampering its ability to oppose summary judgment.  Thus, the propriety of summary judgment for Mulder's is now ripe for a full and fair review.  Since we apply the same *de novo* standard of review that a district court applies in the summary judgment context, it is a better use of judicial resources for this Court to settle the issue now rather than remanding and having to entertain another appeal in the future.

In support of its MUTSA claim against Mulder's, United cites to the testimony of  former employee Chad Alverson, who went to work for Mulder's.  *Appellant's Br.* at 15.  According to Alverson's testimony, he brought a copy of a customer list to Mulder's, and Mulder's owner, Art Mulder, saw the list but told Alverson that Mulder's "didn't need it." (J.A. 447-48.)  Alverson stated that he brought the list back home and "it probably got thrown out." (J.A. 448.)  Mulder testified that for "[a]bout three minutes" he perused a list that he "assum[ed]" had been dropped at his store by Keizer. (J.A. 524-25.)  He then "set it back down" and "then it was gone." (J.A. 526-28.)   Mulder testified that it would have been wrong to use the list and that the list is not in the possession of anyone from Mulder's.

The MUTSA gives a court the power to enjoin an actual or threatened misappropriation of a trade secret, such as an unauthorized disclosure or use of a trade secret. Mich. Comp. Laws Ann. §§ 445.1902, 445.1903.   A "misappropriation" means either:

(i) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means.

(ii) Disclosure or use of a trade secret of another without express or implied consent by a person who did 1 or more of the following:
(A) Used improper means to acquire knowledge of the trade secret.
(B) At the time of the disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or derived from or through a person who owed a duty to the person to maintain its secrecy or limit it use.
(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

*Id.* § 445.1902(b).

There is no evidence that Mulder's has misappropriated or is likely to misappropriate United's customer list.  First, Alverson's acquisition of the list and delivery to Mulder's cannot be imputed to Mulder's.  There is no evidence that Mulder's solicited this conduct or condoned it once the list appeared at the store.  Alverson brought the list to Mulder's completely on his own accord without the knowledge of anyone else at Mulder's. The record shows that Alverson was merely a salesman at Mulder's, not an officer, director or high-level manager whose conduct potentially could bind the company.  *Cf. CMI Int'l,* 649 N.W.2d at 813 ("to make a claim of threatened misappropriation, … the party must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets") (citation omitted).  Thus, Mulder's never "acqui[red]" the list because no one with any meaningful authority at Mulder's either knew or should have known that the list had been acquired through

improper means. In fact, Arthur Mulder testified that he was not sure how the list ended up at his store.[6]

Second, there is no genuine issue of material fact that Mulder's disclosed or used the customer list. Mulder testified that he glanced at the list for three minutes, determined that it would be wrong to use the list, set it down and never saw the list again. As far as anyone knows, the list that appeared at Mulder's existed for a day and then disappeared. Because there is no evidence of a past disclosure or use of the list or any likelihood of a future use or disclosure, summary judgment for Mulder's on the MUTSA claim was proper.

## F. Claims for Intentional Interference with Business Relations, Intentional Interference with Keizer's Employment Agreement and Civil Conspiracy

An essential element of a claim for tortious interference with contract, tortious interference with business relations and civil conspiracy is that the alleged tortious conduct be wrongful. *See Trepel v. Pontiac Osteopathic Hosp.,* 354 N.W.2d 341, 347 (Mich. Ct. App. 1984) (tort of intentional interference with contract or with business relations requires a showing of "illegal, unethical or fraudulent conduct in addition to intentional interference"); *Feaheny v. Caldwell,* 437 N.W.2d 358, 365 (Mich. Ct. App. 1989) (tort of civil conspiracy requires concerted action "to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means"). As discussed above, there is no genuine issue of material fact that Keizer and Grant Rent-All breached the non-compete or

---

[6]Even if Mulder was aware that the list had come from Alverson or Keizer, he would have had no reason to think that they had acquired the list through improper means. To the contrary, Alverson and Keizer acquired the list through proper means presumably because United gave them the list when they were employed at United. The fact that Alverson and/or Keizer perhaps should have returned the list after they left United does not alter the fact that their acquisition of the list was proper.

confidentiality provisions of his employment agreement, nor is there a genuine issue of material fact that Mulder's violated the Michigan Uniform Trade Secrets Act. Accordingly, there is no underlying contractual violation or violation of Michigan common law or statutory law on which to premise these torts. Summary judgment was therefore proper.

## G. Defendant Keizer's Alleged Breach of a Fiduciary Duty of Loyalty

United argues that because the district court's grant of summary judgment on the breach of contract claim was improper, it follows that dismissal of its claim for breach of the fiduciary duty of loyalty also was improper. *Appellant's Br.* at 46-47. United has proffered no other argument on the merits of this claim. As discussed above, the district court properly granted summary judgment on the breach of contract claim. Accordingly, the breach of fiduciary duty claim also was properly dismissed.

### III.
### CONCLUSION

For all the foregoing reasons, the district court's order granting summary judgment to Defendants is **AFFIRMED**.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

WILLIAM STAFFORD, District Judge, concurring in part and dissenting in part. While I agree that summary judgment was properly entered in favor of Keizer and Grant Rent-All, I write separately to address the district court's entry of summary judgment in favor of Mulder's. Mulder's did not file a motion for summary judgment, nor was notice ever given to United that it should introduce evidence to support its claims against Mulder's.

"The clearly established rule in this circuit is that a district court must afford the party against whom *sua sponte* summary judgment is to be entered ten days notice and an adequate opportunity to respond." *Yashon v. Gregory*, 737 F.2d 547, 552 (6th Cir. 1984). "We have underscored this requirement of 'unequivocal notice' on numerous occasions. *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir.2001) (*en banc*) (citing *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 204 (6th Cir.1998)*; Briggs v. Ohio Elections Comm'n*, 61 F.3d 487, 493 (6th Cir.1995); *Yashon v. Gregory*, 737 F.2d 547, 552 (6th Cir.1984)). "Noncompliance with the [ten days notice] provision...deprives the court of authority to grant summary judgment, unless the opposing party has waived this requirement, or there has been no prejudice to the opposing party by the court's failure to comply with this provision of the rule." *Kistner v. Califano*, 579 F.2d 1004, 1006 (6th Cir. 1978) (citations omitted).

On appeal, United states: "[I]f this Court reverses the District Court's ruling on summary judgment as to Count I [breach of contract against Keizer], it follows that this Court should also reverse the District Court's rulings as to Counts IV [tortious interference with Keizer's employment/non-compete covenant] and V [conspiracy to breach the restrictive covenants contained in Keizer's employment contract] as to

Mulder's." Final Br. of Appellant at 47. United makes no other argument with regard to Counts IV and V. Because United appears to concede that Counts IV and Count V against Mulder's cannot survive the grant of summary judgment to Keizer in Count I, I agree that we can affirm the district court as to those two counts. Given our decision to affirm the district court's decision as to Count I, it would be futile to remand Counts IV and V for further proceedings as to Mulder's.

The same is not true of Count II, however. In Count II, United alleges that the defendants, including Mulder's, violated the Michigan Trade Secrets Act by misappropriating United's trade secrets. United argues that the district court's *sua sponte* entry of summary judgment in favor of Mulder's on Count II should be vacated regardless of the decision as to the other counts. I agree. Unlike Counts IV and V, this claim against Mulder's stands on its own and does not fail simply because the claims against Keizer and/or Grant Rent-All fail. The majority claims that "United has proffered whatever evidence and related argument it can muster in opposition to summary judgment on the MUTSA claim against Mulder's." *Infra* p. 22. United, however, cannot offer evidence on appeal that was not part of the record before the trial court; and while I recognize that United has not argued that it was denied critical discovery, I cannot assume that United would not have introduced additional evidence before the trial court had it been given appropriate notice. Because United should have been given notice of, and an opportunity to respond to, the district court's *sua sponte* consideration of summary judgment on the trade secrets claim against Mulder's, and because I cannot conclude from this record that the district court's failure to provide appropriate notice was non-prejudicial, I would vacate the district court's entry of summary judgment in favor of Mulder's as to Count II and would remand for further proceedings as to that claim.