Christopher Todd UPTON, Plaintiff,

Leslie Darnell Jones; Jeffrey Lynn Keylon; James David Parten; Timothy Edward Robbins; and Paul Steven Vance, Plaintiffs–Appellants,

v.

BNFL, INC.; TSB FA Nuclear Services, INC., Defendants–Appellees.

No. 15–5751.

United States Court of Appeals, Sixth Circuit.

April 22, 2016.

BEFORE: BOGGS and KETHLEDGE, Circuit Judges; STAFFORD, District Judge.*

* The Honorable William H. Stafford, Jr., Senior United States District Judge for the North-

PER CURIAM.

Leslie D. Jones, Jeffrey L. Keylon, James D. Parten, Timothy E. Robbins, and Paul S. Vance (collectively "Appellants") are independent subcontractors who claim they were exposed to asbestos containing material ("ACM") as a result of demolition and salvage work they performed for R & R Electric Corporation ("R & R") at R & R's worksite in Oak Ridge, Tennessee. That work had its genesis in 1997 when BNFL, Inc., now known as TSB Nuclear Energy Services, Inc. (hereinafter "BNFL"), entered into a prime contract with the United States Department of Energy ("DOE") to decontaminate, decommission, and recycle three former uranium processing buildings at DOE's East Tennessee Technology Park ("ETTP") in Oak Ridge. The contract included demolition of the associated switchyards (identified as K792 and K–762), which required removal of eight synchronous condensers—four of which were located inside each of the K–792 and K–762 switchyards.

In 2012, in Civil Action No. 3:12cv295, Appellants sued BNFL, among others, asserting claims for outrageous conduct, battery, negligence, negligence per se, negligent failure to warn, reckless infliction of emotional distress, fraud, negligent and fraudulent misrepresentation, strict liability for ultrahazardous activity, strict products liability, and civil conspiracy. The district court granted summary judgment to BNFL on all claims. We affirm.

I

BNFL's prime contract with DOE included removal of the four synchronous condensers located inside ETTP's K–762 switchyard. Each of these condensers

ern District of Florida, sitting by designation.

contained two contiguous components, an exciter and the main condenser, both of which were encased together within one outer shell. The condensers were constructed in the 1950s, weighed approximately two hundred pounds, and contained significant amounts of various metals, including copper wiring, some of which was wrapped in insulating material.

BNFL's business was nuclear remediation. Because nuclear remediation was not involved in the switchyard demolition, BNFL entered into subcontracts for most of the switchyard work. BNFL also entered into sales agreements with salvage companies that wanted to purchase electrical equipment or infrastructure items as they were being removed from the switchyards. Under one such sales agreement (the "Electrical Enterprise Agreement"), BNFL sold to American Technologies, Inc. ("ATI"), various kinds of electrical gear, including the four synchronous condensers located in the K–762 switchyard. BNFL provided no warranty as to the condition or operability of any of the equipment or condensers being sold to ATI, and ATI acknowledged that the electrical gear and condensers were being sold "as is." ATI was responsible for preparing the condensers for removal from BNFL's worksite at ETTP.

When they entered into the Electrical Enterprise Agreement, neither BNFL nor ATI knew for certain that the condensers contained hazardous materials. They were both well aware, however, that hazardous materials—ACMs, lead paint, PCBs (polychlorinated biphenyls)—could be encountered during the demolition process. David Miller, ATI's project manager, knew that asbestos, PCBs, and lead were commonly used materials in the 1950s when the condensers were built. ATI specifically agreed that, if hazardous materials were found in the materials it

purchased from BNFL, it was "prepared to remove the hazardous material at our K–1415 site, package the material, and return the material to BNFL for proper disposal." BNFL required ATI to certify that it would comply with all environmental regulations when managing the disposition of the materials purchased from BNFL. Miller assured BNFL that ATI (1) had successfully performed a large number of projects for DOE, among others, in compliance with all environmental regulations, and (2) would "exercise reasonable and prudent oversight of its subcontractors, vendors, and others dispositioning electrical enterprise materials on behalf of ATI."

To help with the recycling and resale of the equipment it purchased from BNFL, ATI entered into a separate agreement with R & R, a salvage business owned by Gerald Reese. BNFL had no contractual relationship with R & R or with any of its subcontractors, including Appellants. Appellants, moreover, did not work at BNFL's worksite in any capacity before and while ATI's condensers were being readied for removal from BNFL's worksite.

In February 2000, representatives from BNFL and ATI, as well as Gerald Reese from R & R, met to prepare an Enhanced Work Plan ("EWP") to define the process for removing ATI's four condensers from the K–762 switchyard. The EWP detailed the procedures for removing the outer shell from the interior components of the condensers and lifting those components—still intact—onto railcars to be carried to R & R's worksite, known as the K–1415 site, for further disposition. The EWP was not intended to—and did not—extend to demolition of the component parts for recycling once those components left the BNFL worksite. ATI hired Technology Fabrication, Inc. ("Tech Fab"), to perform

the work under the EWP. All of the work at BNFL's worksite was performed in compliance with OSHA and BNFL's own health and safety procedures. None of the work at BFNL's worksite involved R & R's employees or subcontractors.

The hazards associated with the work at the BNFL worksite were listed as bounding conditions in the EWP. One of those bounding conditions warned of the potential presence of ACM located on piping in the pit underneath the condensers. This potential for ACM was discovered by BNFL's sampler, Brady Riggs, when—in preparation for the removal of the condensers—he was asked by BNFL to test for hazardous materials on accessible points in and around the outer shell of the condensers. At the time the EWP was created, BNFL had no information that ACM was inside the condensers.

At or about the same time that it was preparing for the removal of ATI's condensers from the K–762 switchyard, BNFL was also preparing for the removal of the four condensers from the K–792 switchyard. The Coy/Superior Team ("Coy") had subcontracted to remove the condensers from K–792. Like ATI, Coy intended to remove the condensers to its own worksite for scrap recycling. After executing its subcontract but before the condensers had been removed from BNFL's worksite, Coy learned from reading recently discovered operating manuals that there might be ACM in the exciters attached to the main condensers. When Coy passed this information on to BNFL, BNFL immediately stopped all work on both the Coy and the ATI condensers. BNFL then took samples from the exciters and had them tested for ACM. The tests indicated that ACM was present on the lead wires of the exciters. Using its own abatement contractor, BNFL had the asbestos on the lead wires abated for all eight exciters. When the abatement process was completed, ATI and Coy resumed work on their respective condensers. In late May or early June 2000, ATI and Coy loaded their condenser components onto railcars, and moved the components to their own respective worksites.

ATI, through Tech Fab, had its condenser components moved to R & R's K–1415 worksite, where R & R's crew of workers—including Appellants—began disassembling the condenser components. BNFL employees did not oversee and did not participate in the work conducted at R & R's worksite. Knowing that ACM had been found in the condenser pits and on the lead wires to the exciters, ATI's project manager, David Martin, and R & R's owner, Gerald Reese, recognized that ACM could likewise be found inside the condenser components. R & R's workers, including Appellants, nonetheless proceeded to disassemble the condensers without taking adequate safety precautions.

In August 2000, Coy notified BNFL that ACM had been found inside a condenser component at Coy's worksite. BNFL immediately informed David Miller and Gerald Reese about Coy's ACM discovery. By that time, one of ATI's condensers at R & R's work site had been completely gutted and work on the other three had begun. Having learned about the ACM found in Coy's condensers, ATI stopped all work on its condensers.

## II

On November 8, 2001, R & R sued BNFL in a state-court action that was removed to the Eastern District of Tennessee. *R & R Elec. Corp. v. BNFL, Inc.*, No. 3:01cv605. Coy soon after filed a similar action against BNFL in the Eastern District of Tennessee. *The Coy/Superior Team v. BNFL, Inc.*, No. 3:01cv634.

In the removed action, R & R alleged that BNFL made negligent misrepresentations about ACM in the condensers. R & R relied on two representations: (1) the EWP, and (2) alleged verbal assurances from a BNFL representative that no hazardous materials were present on or in the equipment removed from BNFL's worksite. District Judge Thomas Phillips assumed, for purposes of the summary-judgment motion, that the EWP or a BNFL official represented that no ACM remained in the condensers after abatement on the exciters was completed. Judge Phillips nonetheless granted BNFL's motion for summary judgment, finding that any reliance on the alleged misrepresentations was unreasonable. The judge explained:

From the undisputed material evidence, I conclude that R & R's reliance on the alleged misrepresentations was unreasonable given the fact that ATI and R & R were made aware during the negotiations of the Electrical Enterprise Agreement that the condensers could contain asbestos. Second, after the EWP was drafted, but before the condensers were removed from the BNFL work site, asbestos was discovered in the exciters. At that point, R & R was certainly on notice that the EWP was not reliable to the extent that it guaranteed that there was no asbestos in the condensers. R & R, however, removed the condensers to its own work site where it took no precautions against a possible asbestos hazard. Third, R & R's President, Gerald Reese had 20 years experience in dealing with electrical equipment. Reese admitted in his deposition that it made no sense that the exciter would contain asbestos material and the main motor did not. Moreover, R & R performed no inspection for asbestos before continuing disassembly of the condensers, nor did it take any health or safety precautions for its workers or its property. At that point, anyone working on the condensers should have exercised caution and been on guard for additional asbestos regardless of what was stated in the EWP or by representatives of BNFL.

In its lawsuit against BNFL, Coy made the same claims of negligent misrepresentation for failure to disclose the presence of ACM within the condensers but added claims for breach of contract and fraud based on multiple theories. District Judge Leon Jordan granted summary judgment in favor of BNFL as to all but two of these claims, both of which were subsequently tried with a favorable result for BNFL. All of Judge Jordan's determinations as to these claims were affirmed on appeal. *The Coy/Superior Team v. BNFL, Inc.*, 174 Fed.Appx. 901, 909–12 (6th Cir.2006).

Coy also asked the district court for a declaratory judgment that BNFL retained responsibility at all times for the ACM found in the condensers. Coy argued that federal law prohibited BNFL from transferring liability for the asbestos to another party. Judge Jordan granted the declaratory judgment sought by Coy, but that judgment was reversed on appeal. The appellate panel concluded—in reliance on established Sixth Circuit precedent—that environmental liabilities may be contractually shifted by means of an indemnity agreement or by "simply using an 'as is' clause." *Id.* at 908. Because BNFL's subcontract with Coy unambiguously shifted responsibility for the asbestos to Coy when the condensers left BNFL's worksite, the declaratory judgment could not stand.

In early 2003, six R & R subcontractors, including the five Appellants here, filed an action (Civil Action No. 3:03cv52) in the Eastern District of Tennessee against the United States (acting through DOE),

BNFL, ATI, and R & R, alleging the same claims that are alleged in the action (Civil Action No. 3:12cv295) now before this court. Because the claims in Civil Action No. 3:03cv52 were related to asbestos exposure at a facility under DOE oversight, they were referred to the Judicial Panel on Multidistrict Litigation ("MDL"), which in turn assigned the case to the Eastern District of Pennsylvania under the caption *In re: Asbestos Products Liability Litigation (No. VI).* After the United States (i.e., the DOE) was dismissed from the case pursuant to an agreement with the six plaintiffs in July 2005, the case sat dormant in the MDL Court for the next four and a half years.

In December 2009, the MDL Court issued an order severing the six plaintiffs, ordered separate trials for each plaintiff, and directed the Clerk of the MDL Court to assign civil-action numbers to each plaintiff. After severed and amended complaints were filed for each of the six plaintiffs, the MDL Court remanded the six separate cases to the Eastern District of Tennessee. On May 9, 2011, the district court on remand dismissed without prejudice the six cases for lack of subject-matter jurisdiction (the United States was no longer a party and diversity did not exist between the remaining parties).

The six plaintiffs re-filed a single case against BNFL, ATI, and R & R in Tennessee state court on May 7, 2012. BNFL removed that case—the case now before us—on the basis of diversity jurisdiction. R & R and ATI were later dismissed by notice of voluntary dismissal filed by the plaintiffs, leaving only BNFL as a defendant. One of the six plaintiffs (Chris Upton) was dismissed for failure to prosecute. On June 12, 2015, District Judge Curtis Collier granted BNFL's motion for summary judgment as to all claims. Among other things, Judge Collier determined that: (1) any reliance by the plaintiffs on either the EWP or verbal statements by BNFL personnel, to the effect that the condensers would be free from asbestos contamination, was not reasonable, dooming their fraudulent-misrepresentation and negligent-misrepresentation claims; (2) BNFL had no duty to the plaintiffs for work the plaintiffs performed at R & R's work site under subcontracts with R & R, dooming their claims for failure to warn, negligence, and negligent infliction of emotional distress; (3) BNFL asserted no supervisory authority over how the plaintiffs conducted their work, made no employment decisions related to the plaintiffs, and did not exercise any authority over the job site where the plaintiffs performed their work, dooming their claims based on negligence per se and strict liability based on abnormally dangerous activity; (4) BNFL was neither a "seller" nor a "manufacturer" for purposes of Tennessee's strict products liability statute; (5) the plaintiffs failed to present any evidence of conduct "so outrageous that it is not tolerated in civilized society"; and (6) the plaintiffs conceded that they failed to present any evidence to support their battery claim.

### III

We review the district court's grant of summary judgment de novo, viewing the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party. *United Rentals (N. Am.), Inc. v. Keizer,* 355 F.3d 399, 405 (6th Cir.2004).

### IV

■ In their brief, Appellants make several weak arguments. Among other things, they contend that the district court erred in finding unreasonable Appellants' reliance, if any, on BNFL's purported assurances that ACM would not be found

inside the condensers. As Judge Phillips did in R & R's 2001 action against BNFL, the district court assumed, for purposes of the summary-judgment motion, that BNFL indeed represented that the condensers would be free from ACM contamination when those condensers were removed from BNFL's worksite. In finding that Appellants' reliance on any such misrepresentations was not reasonable, the district court noted that, after the alleged misrepresentations were made but before the condensers were transferred to R & R's worksite, ATI's David Miller and R & R's Gerald Reese both knew that ACM had in fact been discovered in the pits underneath the condensers and around the lead wires to the exciters. Given that knowledge and knowing the age of the condensers, both Miller and Reese were well aware that ACM could likewise be found inside the condenser components. Appellants themselves, moreover, were all experienced contractors in the electrical equipment industry who were dismantling old equipment, other components of which had been found to contain ACM. In the words of the district court: "At that point, [Appellants] should have been aware that any EWP statements or verbal statements to the effect that any contaminated material should not leave the BNFL site were unreliable to the extent that [Appellants] took them as guarantees that the material would be free from asbestos contamination." Given our de novo review of the record, we are satisfied that the district court did not err in finding that Appellants' reliance, if any, on BNFL's alleged misrepresentations was not reasonable.

█ Appellants also contend that the district court erred in finding that BNFL had no duty to protect Appellants from ultrahazardous materials that might be encountered in the condensers, even after ATI removed those condensers from BNFL's worksite pursuant to an "as is" sales contract. We find no such error, the record having established that: (1) BNFL did not employ Appellants, asserted no supervisory authority over Appellants, and exercised no control over the job site where Appellants performed their work; (2) BNFL was permitted to, and did, shift to ATI all duties, responsibilities, and liabilities with regard to any ACM found in the condensers when it entered into the "as is" Electrical Enterprise Agreement with ATI, *see, e.g., Coy/Superior Team,* 174 Fed.Appx. at 908; and (3) BNFL was not subject to strict liability under Tennessee's products liability law as a "manufacturer" or "seller." *See* Tenn.Code Ann. §§ 29-28-102,-105,-106. Appellants' arguments to the contrary are without merit.

## V

After careful review of the record and the parties' arguments on appeal, we are satisfied that the district court properly granted summary judgment in favor of BNFL. We AFFIRM.