**GARMEADA COAL CO.**

v.

**INTERNATIONAL UNION OF UNITED MINE WORKERS OF AMERICA et al.**

**No. 615.**

United States District Court
E. D. Kentucky.
July 20, 1954.

James Sampson, James S. Greene, Jr., Harlan, Ky., for plaintiff.

Lay & Knuckles, W. R. Lay, Grant F. Knuckles, Pineville, Ky., for defendants.

FORD, Chief Judge.

This is a suit by an employer against labor organizations alleged to be the representatives of plaintiff's employees in an industry affecting commerce, charging the defendants with violation of certain provisions of a subsisting collective bargaining agreement and seeking damages on account thereof.

Jurisdiction of this Court is properly invoked under the provisions of section 301 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185.

Trial by jury having been waived, the Court heard the evidence and has since considered briefs filed by counsel for the respective parties upon the issues of fact and questions of law presented.

Pertinent facts disclosed by the evidence may be summarized as follows:

In 1952 and for a number of years prior thereto, the plaintiff Garmeada Coal Company, a Kentucky corporation, (sometimes hereinafter referred to as the company) was engaged in mining bituminous coal from a large body of land located near the city of Middlesboro, Bell County, Kentucky. The major portion of its coal production was sold and shipped in interstate commerce. The plaintiff employed about 250 workmen in its mine which was operated under a mineral lease from the landowner, Louisville Property Company. At all times herein referred to, the plaintiff, in the operation of its coal mine, was "an employer" engaged in an industry affecting commerce" within the meaning of the Labor Management Relations Act, 1947.

The defendant, the International Union of United Mine Workers of America, hereinafter sometimes referred to as the Union, is a "labor organization" within the meaning of the Labor Management Relations Act of 1947. The defendants, District 19 of United Mine Workers of America, and Local Union No. 6130, United Mine Workers of America, are subordinate branches or divisions of the United Mine Workers of America which are established and chartered by the International Union pursuant to the provisions of its constitution filed herein as Defendant's Exhibit No. 1 and for the purposes therein set out.

Plaintiff, as a member of Harlan County Coal Operators Association, and defendants, International Union of United Mine Workers of America and District 19 of United Mine Workers of America, were parties to a collective bargaining agreement, known as "National Bituminous Coal Wage Agreement of 1950", which, according to its terms, became effective as of March 5, 1950, and terminated on June 30, 1952. This agreement (subject to the amendments, modifications and supplements as therein provided) carried forward the terms and conditions of the various wage agreements previously entered into by the parties, of which the following provisions germane to the issues herein were in full force and effect to June 30, 1952:

"Sec. 5. Basic Rate

\* \* \* \* \* \*

"The basic rate for loading coal shall include the work required to drill, shoot, clean and load the coal, properly timber the working places in the mine according to the standards of the mine or as the management may direct from the safety point of view and all other work and customs incidental thereto, and the management shall be required to furnish the necessary props, timbers and track material to properly timber all working places as near the face as practical, in compliance with the State Mining Law.

"Where the Operator relieves the loader of any part of the regular work or expense required above, a lower piece rate as mutually agreed upon shall be established to com-

pensate the Operator for that additional expense.

"When ordinary timbers, props, etc., are sent to the miner in mine cars in reasonable amounts he shall unload same.

"*Miners shall lay all temporary track and jumpers; also lay steel rails where steel ties are used. The Operator shall lay all initial turns and switches. The present custom of removing jumpers to enable machines to cut shall be continued.*" (Italics added).

Plaintiff's Exhibit No. 10, pp. 35–36.

"Sec. 12. Management.

"The management of the mine, the direction of the working force, and the right to hire and discharge are vested exclusively in the management and the United Mine Workers of America shall not abridge these rights. * * * "

Plaintiff's Exhibit No. 10, p. 42.

"District Agreements.

* * * * * *

"This agreement supercedes all existing and previous contracts except as incorporated and carried forward herein by reference; and all local agreements, rules, regulations and customs heretofore established in conflict with this Agreement are hereby abolished. Prior practice and custom not in conflict with this Agreement may be continued, but any provisions in District or Local Agreements providing for the levying, assessing or collecting of fines or providing for 'no strike', 'indemnity' or 'guarantee' clauses or provisions are hereby expressly repealed and shall not be applicable during the term of this Agreement. * * "

Plaintiff's Exhibit No. 10, pp. 106–7.

"Settlement of Local and District Disputes.

"Should differences arise between the Mine Workers and the Operator as to the meaning and application of the provisions of this Agreement, or should differences arise about matters not specifically mentioned in this Agreement, or should any local trouble of any kind arise at the mine, an earnest effort shall be made to settle such differences immediately.

"1. Between the aggrieved party and the mine management.

"2. Through the management of the mine and the Mine Committee.

"3. Through District representatives of the United Mine Workers of America and a commissioner representative (where employed) of the coal company.

"4. By a board consisting of four members, two of whom shall be designated by the Mine Workers and two by the Operators.

"5. Should the board fail to agree the matter shall, within thirty (30) days after decision by the board, be referred to an umpire to be mutually agreed upon by the Operator or Operators affected and by the duly designated representatives of the United Mine Workers of America, and the umpire so agreed upon shall expeditiously and without delay decide said case. The decision of the umpire shall be final. Expenses and salary incident to the services of an umpire shall be paid equally by the Operator or Operators affected and by the Mine Workers.

"A decision reached at any stage of the proceedings above outlined shall be binding on both parties hereto and shall not be subject to reopening by any other party or branch of either association except by mutual agreement."

Plaintiff's Exhibit No. 10, pp. 107–109.

"Miscellaneous.

* * * * * *

"4. The United Mine Workers of America and the Operators signatory hereto affirm their intention to maintain the integrity of this con-

tract and to exercise their best efforts through available disciplinary measures to prevent stoppages of work by strike or lockout pending adjustment or adjudication of disputes and grievances in the manner provided in this Agreement."

Plaintiff's Exhibit No. 10, pp. 109–110.

At the time of the occurrences out of which this litigation arose, Ray Thomasson was President of District 19; he was also a member of the International Executive Board of the United Mine Workers of America. Mr. Thomasson and Mr. James W. Ridings who was also a member of the International Board, maintained their offices in a building owned by the Union in Middlesboro, Ky., which was within a few miles of plaintiff's mine. The president of the District was appointed by the International president with the approval of the International Executive Board. Mr. Thomasson thus described his duties:

"My duty is to enforce, where possible, the policy of the United Mine Workers of America, adhere to its Constitution, the enforcement of contract within the District, organize the unorganized and make certain recommendations as affecting the business of the District to the International Executive Board." Tr. of Evidence, p. 694.

District 19 embraced a large area including many coal mining operations both in Tennessee and Kentucky. To effectively carry out the objects and purposes of the Union, the District President employed special workers known as District Representatives or Field Workers. William A. (Bill) Bell was the Field Worker in the territory which included plaintiff's mine and, according to Mr. Thomasson, his duties included visiting mines in his territory from time to time and endeavoring to settle any grievances that may be found between the operators and his employees "in line with the contract and the policy of the organization". This seems to be the Union in action at the operator-employee level.

The defendant, Local No. 6130, as such, was not a party to the collective bargaining agreements. It was merely a subordinate branch of the Union located at plaintiff's mine. Its meetings, from time to time, were held in a schoolhouse in the neighborhood. Jake Abbott, one of plaintiff's employees, was President of the Local.

The so-called "Mine Committee" which was appointed from the membership of the Local to represent the employees in the settlement of grievances and disputes with the company was composed of plaintiff's employees, Roy Lynch, Martin Burchfield and Reuben Burns.

In March 1952, in an effort to promote more efficient operating conditions, the company employed J. C. (Jake) Tolliver, as superintendent of its mines. According to the testimony of Mr. Tolliver, soon after entering upon his duties, he discovered that production of the mine was considerably retarded by reason of the failure of some of the miners to lay steel rails where steel ties were used in constructing the temporary track in their working places, as required by the provisions of the contract above set out. Such men would remain idle until the rails were laid by the company's track men. The rails referred to were the so-called "long rails" measuring from 20 to 30 feet in length and weighing 200–300 pounds, which were used to replace the shorter rails called "jumpers", as the miners progressed in their working places. In April 1952, Mr. Tolliver gave instructions to the Mine Foreman to require the men to lay their own track, including the long steel rails, instead of waiting on the track men to do that work. Many of the workers claimed that this was a radical change from a long-standing practice of the company and vigorously protested against it.

A conference was held between the officers of the company, the Mine Committee and the president of the Local at which time it was agreed that the men would lay the rails under protest and permit the controversy to be decided in accordance with the contract provisions

for the settlement of local disputes. According to the testimony of Roy Lynch, a member of the Mine Committee, this adjustment of the matter was reported to a meeting of the Local and the meeting rejected it. This is confirmed by the minutes of the meeting of April 26th, from which it appears that the Mine Committee "was instructed to make talk at man-trip and tell all men not to lay one long rail".

The ensuing controversy resulted in a concerted stoppage of work by all of plaintiff's employees who were members of the Union. The strike which completely shut down plaintiff's mining operations began on the morning of April 30th, at the direction of Jake Abbott, president of the Local Union, when men, who refused to lay long rails, were denied admittance to their places of employment, and continued until May 31st.

The first question for determination is presented by defendants' amended answer asserting "that the plaintiff has at all times since the contract of 1941, elected to lay the long rails complained of up to April 1952, when without right, plaintiff sought to repudiate its election and custom by requiring the miners to lay said long rails", and (2) that by so doing "the plaintiff thereby waived its right to said benefit by requiring the miners to lay said long rails as provided in said contract during the continuance of the contract."

In the brief filed by counsel for defendants, the issue in this respect is thus stated: "The first question that we wish to present to the court is: Did the employees violate the contract when they refused to lay these long rails? The answer to this question is 'Yes', unless the complainant by election as provided in the contract or by waiver, relieved the coal loaders of this responsibility."

██ Upon this issue the court makes the following findings of fact:

1. It satisfactorily appears that during the period from April 1, 1941, the effective date of the Harlan District Agreement, containing the provision for the laying of the steel rails, until April 1952, the requirement that all the miners lay the long rails was not strictly enforced. During that period some of the miners complied with the agreement, in some instances the company's track men assisted in laying the long rails and in others the track men laid the rails themselves.

2. The conduct of the plaintiff in merely permitting laxity in the enforcement of its contract right was not so inconsistent with an intention to retain the right as to warrant an inference of waiver or relinquishment of it.

3. The proof is insufficient to show that the company elected to abandon its right to enforce the contract or that it intentionally waived or relinquished its right to enforce it.

4. Proof of conduct sufficient to create estoppel is lacking. There is no claim that the alleged waiver was supported by an agreement founded upon a valuable consideration.

██ The law applicable to the situation disclosed by the evidence was aptly stated by Circuit Judge Lindley in Buffan v. Chase National Bank, 7 Cir., 192 F.2d 58, 60, 61, certiorari denied 342 U.S. 944, 72 S.Ct. 558, 96 L.Ed. 702, thus:

"* * * It is a personal right and, obviously, may be waived by the conduct of the one to whom it belongs. Waiver is a voluntary and intentional relinquishment or abandonment of a known existing right or privilege, which, except for such waiver, would have been enjoyed. 67 C.J. 289. It may be expressed formally or it may be implied as a necessary consequence of the waiver's conduct inconsistent with an assertion of retention of the right. It must be proved by the party relying upon it. And if the only proof of intention to waive rests on what a party does or forebears to do, his act or omissions to act should be so manifestly consistent with and indicative of an intent to relinquish voluntarily a particular right that no other reasonable explanation of

his conduct is possible. 67 C.J. 311 and cases there cited."

 Moreover, defendants' claim of waiver is precluded under the rule that "In the absence of conduct creating an estoppel, a waiver must be supported by an agreement founded upon a valuable consideration." Reynolds v. Detroit Fidelity & Surety Co., 6 Cir., 19 F.2d 110, 113; Moss v. Aetna Life Insurance Co., 6 Cir., 73 F.2d 339, 341.

There is neither claim nor proof that the strike here involved was called, authorized or ratified by resolution or other action of the Union or by its District 19, and they challenge plaintiff's claim to the relief sought against them on the ground of the absence of such proof. In support of their challenge, defendants rely upon the rule laid down in United Mine Workers of America v. Coronado Coal Co., 259 U.S. 344, 42 S.Ct. 570, 66 L.Ed. 975.

Section 301(e) of the Labor Management Relations Act, 29 U.S.C.A. § 185(e) provides:

"(e) For the purposes of this section, in determining whether any person is acting as an 'agent' of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling."

In United Mine Workers of America v. Patton, 4 Cir., 211 F.2d 742, 747, Chief Judge Parker points out that the application of the Coronado rule, upon which defendants rely, to suits of this character was expressly excluded by the above section of the Act and that "The history of the Act shows clearly that the intent of Congress was to apply to suits of this character the common law rules with respect to liability for acts of an agent."

In applying the common law rules with respect to liability of the same Union for the acts of a so-called "Field Agent", within the scope and course of his employment, the same court in the same case said:

"The chief argument of defendants in support of their motion for directed verdict is that there is no evidence that they authorized or ratified the strikes upon which plaintiffs rely for recovery. It is true that there is no evidence of any resolution of either the United Mine Workers or District 28 authorizing or ratifying the strikes. There is evidence, however, that the strikes were called by the Field Representative of the United Mine Workers, who was employed by District 28, and that he was engaged in the organization work that was being carried on by the international union through District 28, which was a mere division of the international union. Members of the union are members of local and district unions as well as the international; and of the $4 monthly dues paid by them, $2 goes to the international union, $1 to the local union and $1 to the district organization. It is clear that in carrying on organizational work the field representative is engaged in the business of both the international union and the district and that both are responsible for acts done by him within the scope and course of his employment."

 Relying upon this authority, the plaintiff claims that the Union's field agent, Bill Bell, while in the performance of his duties and acting within the scope and course of his employment instigated the strike of plaintiff's employees which began on April 30, 1952, and closed plaintiff's mine for about one month. The burden of proof was upon the plaintiff to sustain its claim by a fair preponderance of the testimony.

There is considerable conflict in the testimony as to the actions of Mr. Bell when the controversy over the laying of the long rails became acute enough to threaten a strike. It appears that after the employees at the meeting of their Local on April 26th rejected the adjustment of the controversy upon the terms agreed to by their Mine Committee, Mr.

518

Bell, in a further effort to adjust the controversy without a strike, met with the officers of the company and vigorously argued that in fairness to their men the company should not change its practice by requiring them to lay the long rails and expressed the view that the men would not lay the long rails under any circumstances. The preponderance of the evidence is convincing, however, that at all times Bell took the position that if the company insisted upon its demand under the contract, it was the duty of the employees to lay the long rails. He made his position clear in this respect to the Mine Committee, both before and after his conference with the officers of the company. The testimony given by some of the employees tending to show that Bell instigated the work stoppage seems to be adequately negatived by the overwhelming proof of his urgent appeals to the men to discontinue their strike and return to their work.

At the meetings of the Local Union and at other times during the strike, Mr. Bell, Mr. Thomasson and Mr. Ridings, representatives of the Union, diligently endeavored to convince the employees that it was their duty to return to their work and observe the provisions of the contract. It is clear that the action of the company in altering its liberal practice in respect to the contract requirement that miners lay the long rails, taken when only a little more than two months remained before the contract expired, was calculated to arouse in the employees a bitterness of spirit difficult to allay or mollify. The men had become so enraged at what they regarded as an unjust imposition upon them by the company and were in such a state of rebellion that it was obviously impossible to then persuade them to desist from pursuing their right to strike regardless of the provisions of the contract. Even the suggestion that their rebellious conduct might result in revocation of their Union charter seemed to have little effect. It was only after sufficient time had elapsed for the cooling of the heated tempers aroused by the controversy that Mr. Bell, Mr. Thomasson and Mr. Ridings were finally able to induce the majority of the workmen to discontinue the strike.

It appears to me from the evidence that these representatives of the Union did all that could reasonably have been expected of them in observing their duty to exercise their best efforts to maintain the integrity of the contract and to prevent the strike.

Threats and criticisms directed at plaintiff's superintendent, Mr. Tolliver, were the acts of individual miners, not of the Union.

The result of my consideration of the entire record is the conclusion that plaintiff failed to sustain the burden of showing by a preponderance of evidence that the Union or any agent of the Union, acting within the scope or course of his authority, violated any provision of the collective bargaining agreement. Vicarious liability should rest upon more convincing evidence than that relied upon by plaintiff.

For the reasons indicated, the plaintiff's claim for damages against defendants should be denied.

Let judgment be entered accordingly.