NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 07a0621n.06
Filed: August 24, 2007

No. 06-6467

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

EXCEL ENERGY, INC.,

     Plaintiff-Appellant,

v.

CANNELTON SALES COMPANY, CYPRUS
AMAX COAL SALES CORPORATION and
CYPRUS AMAX COAL COMPANY,

     Defendants-Appellees.

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF KENTUCKY

_____/

BEFORE:    CLAY and SUTTON, Circuit Judges; and GREER, District Judge.[*]

    **CLAY, Circuit Judge.** This case in diversity concerns an action on a contract between a company that supplies coal and a company that resells coal. Plaintiff Excel Energy, Inc. entered into a contract with Cannelton Sales Co. ("Cannelton"). The contract gave Plaintiff "exclusive rights" to Cannelton's coal "for presentation" to the owner of a cement manufacturing facility. Defendants Cyprus Amax Coal Sales Corp. and Cyprus Amax Coal Co. (collectively "Defendants"), who became part of the same corporate ownership structure as Cannelton after the contract was formed, bid against Plaintiff to sell coal to the cement manufacturer. Defendants offered coal from a separate coal mine, but reserved the right to substitute coal from their affiliates. They won the bid. On a

_____

[*] The Honorable J. Ronnie Greer, United States District Judge for the Eastern District of Tennessee, sitting by designation.

second occasion, Defendants explicitly bid coal from Cannelton's mine, and Plaintiff did not bid at all; Defendants again won the bid.

Plaintiff sued, alleging that Defendants breached the contract, violated the implied covenant of good faith and fair dealing, and intentionally interfered with Plaintiff's prospective contractual relation. After the parties filed cross-motions for summary judgment, the district court granted summary judgment in favor of Defendants on all of Plaintiff's claims, including claims that neither party had briefed. Plaintiff then brought this appeal. For the reasons stated below, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for further proceedings consistent with this opinion.

## BACKGROUND

Prior to 1994, Plaintiff supplied the coal used in a cement facility owned by the Missouri Portland Cement Company ("Missouri Portland") in Joppa, Illinois (the "Joppa facility"). The last supply contract between Plaintiff and Missouri Portland began on January 1, 1991, and ended on December 31, 1993. Under this contract, Plaintiff sold coal to Missouri Portland at the price of $28.75 per ton during 1991, and at the price of $29.25 per ton during 1992 and 1993.

Near the end of 1992, Max Frailey, then the manager of the Joppa facility, had a discussion with William LeMaster, of Plaintiff. Frailey and Plaintiff discussed the possibility of Plaintiff finding a different supplier of coal for the Joppa facility. (Plaintiff was not supplying coal from Defendants' mines at the time).

On March 24, 1993, Plaintiff and Cannelton entered into the contract at issue in this litigation, which this opinion will call the "Cannelton Contract." The Cannelton Contract, which is a one-page letter agreement, states in relevant part:

> Cannelton Sales Company is pleased to grant exclusive rights for Cannelton's Kanawha Division coal to Excel Energy, Inc. for presentation to Missouri Portland Cement Plant located at Joppa, Illinois owned by Lafarge Corporation. This agreement does not preclude Cannelton from contacting Lafarge regarding Cannelton's coal to any of the other plants or facilities for which Lafarge buys coal.
>
> Excel Energy, Inc. will not make any binding quotation, accept any order, or enter into any contract on behalf of Cannelton Sales Company without written approval from Cannelton Sales Company.
>
> Cannelton Sales Company and Excel Energy, Inc. have entered into a Coal Sales Agreement dated March 24, 1993 for a test order of coal to the Missouri Portland Cement Plant located at Joppa, Illinois which is covered under this letter of authorization.
>
> This authorization expires on December 31, 1994, but can be extended upon mutual written agreement.

J.A. at 367.

In November of 1993, Amax, Inc., the ultimate parent company of Cannelton, merged with Cyprus Minerals Co., the ultimate parent company of Defendants. The merger of Amax, Inc. and Cyprus Minerals Co. created a new company, Cyprus Amax Minerals Co. Defendant Cyprus Amax Coal Sales Corp. and Defendant Cyprus Amax Coal Co. each remained a separate corporate entity after the merger, as did Cannelton. Both before and after the merger, Cyprus Minerals Co. had a wholly owned subsidiary, Cyprus Kanawha Corp., which owned the Armstrong Creek coal mine. (This opinion refers to coal from this mine as "Armstrong Coal.") Thus, one effect of the merger was to bring the Armstrong Creek coal mine within the same corporate ownership structure as the Cannelton Kanawha Division coal mines, which are the coal mines that produce the coal that is the subject of the Cannelton Contract (hereinafter "Cannelton Coal").

Meanwhile, sometime in 1992 to 1993, LaFarge Corp. ("LaFarge") acquired Missouri Portland, making it the indirect owner of the Joppa facility. In August of 1993, LeMaster, on behalf of Plaintiff, contacted Frailey at the Joppa facility about extending the agreement between Plaintiff and Missouri Portland to supply coal to the Joppa facility through 1995. Their discussions did not result in a contract. Instead, as of sometime in 1993, LaFarge assigned Jay Austin, who had worked at LaFarge before the merger, coal purchasing authority for the Joppa facility. Austin decided that LaFarge would allow companies to submit bids to supply coal to the Joppa facility.

Both Plaintiff and Defendants[1] received an invitation to bid on the coal requirements for the Joppa facility. Plaintiff submitted its bid on November 30, 1993. Its bid contained two options. Plaintiff offered to supply the Joppa facility with coal for the first quarter of 1994 at $27.82 per ton of coal; it also offered to supply the Joppa facility for the entire year at the price of $26.90 per ton.

Defendants also submitted a bid to supply coal to the Joppa facility. A draft bid, dated November 28, 1993, indicated that the coal would be vended from Cannelton, Inc., *i.e.*, that Defendants would sell Cannelton Coal. The submitted coal proposal, dated November 29, 1993, replaced Cannelton, Inc. with Cyprus Kanawha Coporation (*i.e.*, Armstrong Coal), but used identical coal specifications.[2] Defendants submitted their bid on November 30, 1993. The cover letter stated:

---

[1] For the sake of simplicity, this opinion refers to "Defendants" collectively, notwithstanding the fact that an event might have concerned only Defendant Cyprus Amax Coal Co. or Defendant Cyprus Amax Coal Sales Corp. individually. For the purpose of this appeal, the distinction between the two corporations is immaterial.

[2] The specifications provide information about various features relevant to the performance of coal. The specifications included "moisture," "volatile," "ash," "sulfur," "btu," "oxygen," "chlorine," "hydrogen," "nitrogen," a "gridability index," and fourteen specifications analyzing ash. J.A. at 290, 380.

Cyprus Amax Coal Sales Coporation on behalf of its affilitate Cyprus Kanawha Corporation is pleased to submit the attached proposal to supply coal to Lafarge Corporation's cement plant in Joppa, Illinois during the first quarter of 1994.

You are probably aware of the recent merger between Cyprus Minerals Company and Amax. This coal is being offered with the understanding that Cyprus Kanawha Corporation has the right to substitute coal from any of its affiliates controlled by Cyprus Amax Coal Company provided, of course, that Lafarge Coporation agrees to the suitability of the substitute coal as fuel. . . .

Per your solicitation, I am enclosing a copy of typical analyses of the coal offered.

J.A. at 289.

Defendants' bid contained a coal price of $26.00 per ton. LaFarge accepted Defendants' bid, and, after negotiation, the parties agreed on a price of $25.21 per ton, with the lower price most likely reflecting other business opportunities for Defendants with LaFarge.

LaFarge subsequently solicited bids to supply coal to the Joppa facility for the remainder of 1994. The record is not clear about whether LaFarge solicited a bid from Plaintiff, but it is undisputed that Plaintiff never submitted a second bid to supply the Joppa facility with coal for the rest of the year. Defendants submitted their bid to supply coal to the Joppa facility in March of 1994.[3] LaFarge again accepted Defendants' bid, which identified the location of the coal as "London Pool" "milepost 84.3 and/or 87.3." J.A. at 293. These mileposts correspond to Cannelton Coal and Armstrong Coal, respectively.

---

[3] Defendants contend that their bid was for "an unspecified number of LaFarge plants in addition to the Joppa plant." Defendants' Br. at 11. In support of that claim, they point to the cover letter to their bid form, which states that they are "pleased to offer coal to fulfill LaFarge Corporation's 1994 coal requirements as indicated in the enclosed bid forms." J.A. at 292. The enclosed bid form, however, has "Joppa, Il" typed in large font across the top, and mentions no other facilities.

Defendants subsequently sold Cannelton Coal to LaFarge. According to Defendants, throughout the course of 1994, they sold 47,009.86 tons of Cannelton Coal for use at the Joppa facility, which is approximately one-third of the total of 141,093.92 tons of coal supplied. Defendants state that Cannelton Coal was supplied "predominately at the end of 1994." J.A. at 58.

Plaintiff sued for alleged tort and contract law violations in the Jefferson Circuit Court in Jefferson County, Kentucky in October of 1998. Defendants removed the case to the Western District of Kentucky on the basis of diversity jurisdiction. As amended, Plaintiff's complaint alleged three causes of action: (1) breach of contract, (2) intentional interference with prospective contractual relations, and (3) breach of the duty of good faith and fair dealing. Plaintiff also sought punitive damages.

After a lengthy period of discovery, Defendants filed a motion for summary judgment on April 25, 2005.[4] Defendants' motion focused almost exclusively on their arguments that they were not liable on the Cannelton Contract under successor-in-liability principles, and that Plaintiff could not recover on its intentional interference with prospective contractual relation claim. Plaintiff filed a cross-motion for partial summary judgment on November 18, 2005. Plaintiff disputed Defendants' contentions on both issues, and asked the district court to grant summary judgment in its favor on the issue of liability.

On July 31, 2006, the district court granted summary judgment in favor of Defendants. *Excel Energy, Inc. v. Cyprus Amax Coal Sales Corp.*, No. 3:98-CV-713-S, 2006 WL 2225140 (W.D. Ky.

---

[4] Cannelton, which was in bankruptcy, filed a motion to dismiss on December 10, 2004. Its motion was granted, with prejudice, except with respect to the assertion of claims in bankruptcy.

July 31, 2006) (unpublished). The district court first concluded that Plaintiff could not recover on its intentional interference with prospective contractual relation claim. *Id.* at *3-*4. The district court, however, then passed over the arguments made by the parties and assumed that Defendants were bound by the Cannelton Contract. Nevertheless, the district court found that Plaintiff could not demonstrate a breach of contract. *Id.* at *5. The district court proceeded to dismiss the case with prejudice without mentioning Plaintiff's breach of the implied covenant of good faith and fair dealing claim.

Plaintiff filed a timely motion to alter, amend, or vacate the judgment pursuant to Federal Rule of Civil Procedure 59(e), which advanced several arguments. Plaintiff argued that the district court should not have granted summary judgment on the breach of contract claim because the court's decision was "at odds with the arguments presented." J.A. at 630. Plaintiff also contended that Defendants were not entitled to summary judgment on the merits of either the breach of contract or the intentional interference with prospective contractual relation claim. Finally, Plaintiff argued that the district court ignored, and therefore did not resolve, its claim alleging a breach of the implied duty of good faith and fair dealing.

The district court denied Plaintiff's motion to alter or amend. It reasoned that all of Plaintiff's claims were properly before it, noting that Plaintiff's motion for an extension of time to respond to Defendants' motion for summary judgment stated that Defendants' motion was "not limited to the issue of subsidiary liability, but seeks summary judgment on the basis of all potential factual and legal issues." J.A. at 653. The district court also noted that both Plaintiff and Defendants sought summary judgment on "all claims." J.A. at 653. The district court reaffirmed its holdings

on the breach of contract and intentional interference with prospective contractual relation claims, and held that, "[i]n light of these findings, the claim for breach of the implied covenant of good faith and fair dealing that runs with the contract was also subject to dismissal, though not explicitly stated." J.A. at 657. Plaintiff thereafter filed a timely notice of appeal.

## DISCUSSION

Plaintiff raises several arguments on appeal. Plaintiff contends that, as a procedural matter, the district court abused its discretion by *sua sponte* granting summary judgment in favor of Defendants on Plaintiff's breach of contract and breach of the implied covenant of good faith and fair dealing claims. Plaintiff also argues that, on the merits, the district court erred by granting summary judgment in favor of Defendants on all its claims.[5]

### A.      Standard of Review

"When a district court grants summary judgment sua sponte, its decision is subject to two separate standards of review." *Bennett v. City of Eastpointe*, 410 F.3d 810, 816 (6th Cir. 2005) (quoting *Shelby County Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund*, 203 F.3d 926, 931 (6th Cir. 2000)). The district court's procedural decision to enter summary judgment *sua sponte* is reviewed for abuse of discretion. *Id.* If the district court abused its discretion to control the proceedings before it by granting summary judgment, then this Court will remand so that the district court can decide the motion for summary judgment, in the first instance

---

[5] The district court's opinion did not address whether Defendants were liable on the Cannelton Contract as successors in interest. Likewise, the parties do not address this issue in their briefs before this Court. We follow suit and decline to express any opinion on this matter.

implementing procedures in conformity with law. *See id.* (citing *Shelby County Health Care Corp.*, 203 F.3d at 931).

If the district court did not abuse its discretion by granting summary judgment, then we analyze the merits of the case under the familiar summary judgment standard. *Id.* at 816 (citing *Shelby County Health Care Corp.*, 203 F.3d at 931). That is, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact" and that the party for whom summary judgment was granted is entitled to judgment as a matter of law. *Max Arnold & Sons, LLC v. W.L. Hailey & Co.*, 452 F.3d 494, 498-99 (6th Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). The Court must draw all the inferences in favor of the party against whom summary judgment was granted. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A genuine issue of material fact exists where there is sufficient evidence for a jury to return a verdict in favor of either party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

**B.      Procedure for Granting Summary Judgment**

While we discourage granting summary judgment *sua sponte* on grounds not urged by either party, see *Beaty v. United States*, 937 F.2d 288, 292 (6th Cir. 1991), we do not prohibit the practice per se. *Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 204 (6th Cir. 1998). The Supreme Court has acknowledged this practice approvingly, albeit in dicta.[6] *See Celotex Corp. v. Catrett*, 477 U.S. 317,

---

[6] Likewise, the Federal Rules of Civil Procedure contemplate that a district court may *sua sponte* grant summary judgment by converting a motion to dismiss filed pursuant to Rule 12(b)(6) into a motion for summary judgment, provided that "all parties shall be given reasonable opportunity

326 (1986). The key inquiry is whether the losing party was on notice that he had to muster the necessary facts to withstand summary judgment, lest he face the dismissal of his claims. *See id.* ("Our conclusion is bolstered by the fact that district courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence."); *Bennett*, 410 F.3d at 816. However, even in circumstances where the procedure implemented by the district court did not provide adequate notice to the party against whom summary judgment was granted, this Court has upheld the judgment of the district court where the losing party could not demonstrate prejudice; that is, where remanding the case to the district court would merely entail an empty formality with no appreciable possibility of altering the judgment. *United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 411 (6th Cir. 2004) (citing *Kistner v. Califano*, 579 F.2d 1004, 1006 (6th Cir. 1978)); *cf. Sommer v. Davis*, 317 F.3d 686, 695 (6th Cir. 2003) (holding that a factor to consider in determining whether the district court's *sua sponte* grant of summary judgment was proper was "whether [the losing party] had a facially meritorious defense to the judgment").

Where the district court has allegedly granted summary judgment *sua sponte*, this Court looks to the totality of proceedings before the district court to determine whether the losing party had sufficient notice that summary judgment could be granted against him.[7] In making this

---

to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. 12(b)(6); s*ee Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 104-05 (6th Cir. 1995).

[7] The question of *whether* the district court granted summary judgment *sua sponte* is not always clear. Though often this issue can be conclusively resolved simply by examining the docket sheet and the motions filed, in some cases the line becomes blurred. For example, sometimes a court cannot clearly discern whether a motion for summary judgment reaches all of the opposing party's

determination, courts have looked to, for example, whether the prevailing party filed a motion for summary judgment, and if so, what claims that motion purported to address, see *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 104 (6th Cir. 1995); *GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1084, 1089-90 (6th Cir. 1998); what issues the parties focused on in their briefs, see *Bennett*, 410 F.3d at 817; *GBJ Corp.*, 139 F.3d at 1089-90; the factual materials that the parties submitted to the court, see *Shelby County Health Care Corp.*, 203 F.3d at 931-32; *Salephour*, 159 F.3d at 204; motions filed by co-defendants, see *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 407 (6th Cir. 1999); and whether the losing party had himself filed a motion for summary judgment, see *Pueblo of Santa Ana v. Mountain States Tel. and Tel. Co.*, 734 F.2d 1402, 1408 (10th Cir. 1984) ("[T]he commentators generally agree that where there is no genuine issue of fact, the court may enter summary judgment for either party, whether or not such party has made a motion therefor."), *rev'd on other grounds*, 472 U.S. 237 (1985).

In the instant case, we hold that, as a procedural matter, the district court did not abuse its discretion in granting summary judgment in favor of Defendants on Plaintiff's breach of contract claim. Defendants filed a motion for summary judgment, though it summarily asked that their motion for summary judgment "should be granted." J.A. at 55. Although Defendants' motion

---

claims or merely a subset thereof, or whether the motion extends to all issues in the case or constitutes only a motion for partial summary judgment. This inquiry, however, is not truly distinct from the question of notice. Though a properly filed motion for summary judgment adjudicated in accordance with Rule 56 generally always provides the opposing party with adequate notice, the converse is not necessarily true. Furthermore, a mere conclusory request for judgment "on all claims," does not safeguard the motion from procedural challenges, especially insofar as the motion and accompanying papers fail to offer argument against all the opposing party's claims or defenses. *See GBJ Corp. v. E. Ohio Paving Co.*, 139 F.3d 1080, 1084, 1089-90 (6th Cir. 1998).

focused almost entirely on their argument that they were not bound by Cannelton's contract,[8] Defendants did state that "[e]ven if [they] had been affiliated with Cannelton when the March 1993 Agreement was executed (which [they were] not), [Defendants] would have been free to sell [their] coal direct to Joppa in 1994," implying that Plaintiff's breach of contract claim lacked merit.[9] J.A. at 557.

Additionally, the record indicates that Plaintiff perceived Defendants' motion for summary judgment as covering more than the issue of successor-in-interest liability. In its motion for an extension of time to respond to Defendants' motion for summary judgment, Plaintiff contended that Defendants' summary judgment motion "is much broader in scope than represented" and that the "[m]otion is not limited to the issue of subsidiary liability but seeks summary judgment on the basis of all potential factual and legal issues." J.A. at 307.[10] Plaintiff's own motion for summary judgment also formally implicated its breach of contract claim. Though, like Defendants, Plaintiff principally focused on the successor-in-interest issue, its motion for summary judgment "move[d]

---

[8] Defendants' and Plaintiff's motions each also addressed Plaintiff's intentional interference with prospective contractual relation claim; there is no question that the district court, as a procedural matter, acted properly in granting summary judgment on this claim. This aspect of the district court's judgment is excluded from the discussion herein.

[9] This statement occurs in Defendants' Reply in Support of their Motion for Summary Judgment and Response in Opposition to Plaintiff's Motion for Summary Judgment, which was filed before Plaintiff filed its reply. Plaintiff thus had an opportunity to submit materials relevant to the breach of contract claim before the district court issued its ruling.

[10] Perhaps recognizing that this statement suggests that Plaintiff had actual notice that Defendants' motion applied to its breach of contract claim, Plaintiff attempts to distance itself from this representation by dismissing it as a "hyperbolic phrase" that "centered upon the representation by the Defendants that their Motion for Summary Judgment would be limited to the issue of successor-in-interest liability." Plaintiff's Br. at 10-11.

this Court to enter summary judgment finding that . . . Defendants breached [the Cannelton Contract]." J.A. at 323. Even if these statements amount to a careless use of language on the part of Plaintiff, we can fairly conclude that Plaintiff invited the grant of summary judgment through its ill-considered arguments to the district court.

The parties also presented a voluminous record to the district court. Though we will not attempt to survey that record here, we note the district court was presented with several hundred pages of documents, affidavits, and deposition testimony. Furthermore, the parties had taken extensive discovery prior to filing their motions; in fact, Plaintiff points to no evidence that would have been necessary for the district court to reach an accurate determination on the merits, but which was not submitted to the district court. *See Ramsey v. Coughlin*, 94 F.3d 71, 74 (2d Cir. 1996) (noting that summary judgment is procedurally appropriate where the record reflects "the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment"). For these reasons, we hold that, as a procedural matter, the district court did not abuse its discretion by granting summary judgment.

These considerations weigh differently, however, on the question of whether the district court appropriately granted summary judgment on Plaintiff's breach of the implied covenant of good faith and fair dealing claim.[11] This Court has repeatedly found an abuse of discretion where the

---

[11] Kentucky law recognizes a breach of the implied covenant of good faith and fair dealing as a distinct cause of action from breach of contract. *Ranier v. Mount Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991) (holding that a subordination agreement was not breached but that the bank violated its implied covenant of good faith and fair dealing). Thus, Defendants contention that "a claim for breach of the implied covenant of good faith and fair dealing [is] nothing more than a form of a claim for breach of contract" is false, or, at best, so general that it is irrelevant. Defendants' Br. at 26.

district court *sua sponte* grants summary judgment on an issue on which the parties have provided little or no argument. *See, e.g.*, *Shelby County Health Care Corp.*, 203 F.3d at 933 (holding that the district court erred in granting summary judgment as to the amount of benefits owed to the plaintiff where the parties' briefs only addressed the issue of liability); *GBJ Corp.*, 139 F.3d at 1089-90 (holding that the district court abused its discretion by granting summary judgment in favor of the defendants on the plaintiffs' second cause of action where the defendants' memorandum accompanying their motion did not state any reason why the plaintiffs' second cause of action should be dismissed); *cf. Employers Ins. of Wausau*, 69 F.3d at 104 ("[C]onclusory statements offered at the beginning and end of a memorandum of law are clearly not a motion [for summary judgment].").

Neither Plaintiff nor Defendants mentioned the breach of the implied covenant of good faith and fair dealing claim in any part of their briefing; nor did anything in either Defendants' or Plaintiff's motions for summary judgment suggest that this claim was before the district court. Thus, the proceedings deprived Plaintiff of any meaningful opportunity to offer argument to the district court as to why Defendants were liable on this claim.[12] Moreover, the district court's memorandum opinion granting summary judgment in favor of Defendants, though it dismissed Plaintiff's case with

---

[12] Defendants also contend that a remand is not required because "there is no distinction between the evidence required to support Excel's express contract and tortious interference claims and its covenant of good faith and fair dealing claim, as under any theory there is no liability if the defendants acted in good faith in an effort to assert their own legally protected rights or interests." Defendants' Br. at 26. The claim that these causes of action concern identical evidence is not supported by Kentucky Law. *Compare Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857-59 (Ky. 1988) (discussing intentional interference with prospective contractual relation) *with Ranier*, 812 S.W.2d at 156-57 (discussing breach of the implied covenant of good faith and fair dealing). And even assuming that the evidence were coterminous, a remand would nevertheless be proper to provide Plaintiff with the opportunity to present arguments to the district court.

prejudice, never addressed Plaintiff's breach of the implied covenant of good faith and fair dealing claim, nor does the opinion state that Plaintiff has claims that the district court deemed unworthy of discussion. Plaintiff may well have been "understandably surprised by the proceedings" that resolved this claim against it. *See Bennett*, 410 F.3d at 817 (internal quotation marks omitted). Accordingly, we hold that the Plaintiff's breach of the covenant of good faith and fair dealing claim must be remanded for initial consideration by the district court.

## C.      Breach of Contract

Plaintiff's breach of contract claim turns on the proper interpretation of the Cannelton Contract. Under Kentucky law, "the construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Frear v. P.T.A. Industs., Inc.*, 103 S.W.3d 99, 105 (Ky. 2003) (quoting *First Commonwealth Bank of Prestonsburg v. West*, 55 S.W.3d 829, 835 (Ky. Ct. App. 2000)). The first question that a court must answer is whether the terms of the agreement are ambiguous. *Id.* at 105-06. If the contract is unambiguous, the court will "enforce the agreement strictly according to its terms and assign the contract language in dispute its ordinary meaning, without considering extrinsic evidence." *Republic/NFR &C Parking of Louisville v. Reg'l Airport Auth. of Louisville and Jefferson County*, 410 F.3d 888, 891 (6th Cir. 2005) (applying Kentucky law). However, if the contract is ambiguous, "the court will gather, if possible, the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written." *Whitlow v. Whitlow*, 267 S.W.2d 739, 740 (Ky. 1954). A contract is ambiguous if it

is susceptible to more than one reasonable interpretation. *Central Bank & Trust Co. v. Kincaid*, 617

S.W.2d 32, 33 (Ky. 1981).

The key interpretive issue turns on the word "presentation" in the Cannelton Contract. To

reiterate, the Cannelton Contract states in relevant part:

> Cannelton Sales Company *is pleased to grant exclusive rights for Cannelton's Kanawha Division coal to Excel Energy, Inc. for presentation to Missouri Portland Cement Plant located at Joppa, Illinois* owned by Lafarge Corporation. This agreement does not preclude Cannelton from contacting Lafarge regarding Cannelton's coal to any of the other plants or facilities for which Lafarge buys coal.

J.A. at 367 (emphasis added).

Plaintiff argues that "'[p]resentation' clearly meant that Excel had the right to supply the coal

to Lafarge under the Cannelton [Contract]," Plaintiff's Br. at 18; Defendants retort that the plain

meaning of "presentation" in this context is "bid," and hence they were not precluded from supplying

Cannelton Coal to LaFarge. We conclude that word "presentation" could reasonably bear either of

these meanings, and hence the term is ambiguous.[13] Accordingly, we may properly consider factors beyond the four corners of the contract. *See Whitlow*, 267 S.W.2d at 740.

We find that "the situation of the parties and the conditions under which the contract was written," see *id.*, is a particularly salient fact to consider when interpreting the Cannelton Contract. Specifically, the Cannelton Contract was executed in March of 1993, before Lafarge made the decision to procure the 1994 coal supply through an open bidding process. As the prior dealings between Plaintiff and Missouri Portland demonstrate, at the time that the Cannelton Contract was executed, Plaintiff supplied coal to the Joppa facility by approaching Missouri Portland and negotiating a contract between Plaintiff and Missouri Portland; in other words, Plaintiff sold coal to Missouri Portland. In light of this fact, we conclude that the most reasonable interpretation of

---

[13] Defendants make two arguments in support of their plain-text interpretation of "presentation." First, Defendants contend that dictionary definitions support their meaning. Defendants' Br. at 33-34 (citing American Heritage Dictionary (2d Coll. ed. 1985) (defining "presentation" as "the process of offering for consideration"); Miriam-Webster's Online Dictionary, http://mw1.merriam-webster.com/dictionary/present (defining "present" as "to bring or introduce into the presence of someone" and "to offer to view"); Black's Law Dictionary (8th ed. 2004) (defining "presentation" as "the delivery of a document to [a] . . . named person for the purpose of initiating action")). These definitions are not conclusive. For instance, the American Heritage Dictionary's definition equates "presentation" to an offer–but coal cannot be sold without first being offered for sale. Thus, incorporating "offer" into the definition of "presentation" could forbid not merely bidding, but, by implication, sale.

Second, Defendants argue that "presentation" cannot mean "sale" or "supply" because "Cannelton could not provide Excel with anything other than a right to bid its coal, as Excel had no right to supply coal to the Joppa plant after 1993 and Cannelton could not determine who LaFarge would select to provide coal to the plant during 1994." Defendants' Br. at 34. This argument relies on a false premise: that in order for Plaintiff to have the exclusive right to sell Cannelton Coal to LaFarge, Plaintiff must first have convinced LaFarge to buy Cannelton Coal. This is simply not the case. Were this argument accepted, it would imply that, even in the face of clear language providing Plaintiff with an exclusive right to sell Cannelton Coal to the Joppa facility, the contract would be void unless Plaintiff had first procured the exclusive right to supply coal to LaFarge. Nothing in the law of contracts supports this conclusion.

"presentation" in the context of the Cannelton Contract includes offering to sell coal to LaFarge, whether or not such an offer was made in the context of a bid solicited by LaFarge.

### 1. *The November of 1993 Bid*

Having assumed that the Cannelton Contract binds Defendants, and having concluded that Defendants would have breached the contract if they offered to sell coal to LaFarge for use at the Joppa facility, we must next determine whether a reasonable jury could find that Defendants breached the Cannelton Contract through their November 30, 1993 bid. To repeat, Defendants' cover letter attached to their bid stated:

> This coal is being offered with the understanding that Cyprus Kanawha Corporation has the right to substitute coal from any of its affiliates controlled by Cyprus Amax Coal Company provided, of course, that Lafarge Corporation agrees to the suitability of the substitute coal as fuel.

J.A. at 289.

We hold that, assuming that Defendants are bound by the Cannelton Contract, a reasonable jury could find that Defendants violated the Cannelton Contract by submitting their November of 1993 bid. First, a reasonable jury could conclude that the November of 1993 bid constituted an offer to sell Cannelton Coal. In a November 28, 1993 draft of its bid submitted to LaFarge, Defendants prepared a proposal to offer LaFarge Cannelton Coal. That proposal contained exact specifications for Cannelton Coal. These specifications were identical to the specifications for Armstrong Coal in the bid that was actually submitted two days later. In fact, the only difference between the draft coal proposal and the coal proposal finally submitted was the name and location of the vendor–that is, Defendants substituted Armstrong Coal for Cannelton Coal. Plaintiff makes much of this fact, implying that Defendants merely changed the name of the coal mine on its bid; hence, the

-18-

specifications submitted were actually specifications for Cannelton Coal. We need not opine on the plausibility of this theory. Even assuming that the specifications ultimately submitted by Defendants were produced by tests conducted on Armstrong Coal, Defendants must have known that Cannelton Coal was effectively identical to Armstrong Coal. Accordingly, Defendants knew that Cannelton Coal could be substituted for Armstrong Coal, and their reservation of the right to substitute coal from their affiliates meant that Defendants could, at their election, sell LaFarge Cannelton Coal.[14] (That is, because there was no realistic possibility that LaFarge would find the identical Cannelton Coal unsuitable, the proposal in effect offered LaFarge Cannelton Coal or Armstrong Coal, at Defendants' option.) A reasonable jury could find that Defendants' November of 1993 bid constituted an offer to sell Cannelton Coal, and was thus a breach of the Cannelton Contract.

Second, and more straightforwardly, a reasonable jury could find that Defendants breached the Cannelton Contract by actually selling Cannelton Coal to LaFarge for use at the Joppa facility.

---

[14] The district court found that Defendants' bid offered to supply Armstrong Coal "[o]n its face." *Excel Energy, Inc.*, 2006 WL 2225140, at *5. This is a cramped reading of the language of Defendants' bid, which clearly reserved the right to supply coal from one of its affiliates, *i.e.*, Cannelton Coal. While a jury might accept the district court's interpretation, it need not, which is the standard we apply on summary judgment.

Defendants also argue, as the district court found, that the right to substitute coal was a standard term commonly included in coal supply bids. Even assuming that this fact is true, the conclusion that Defendants did not breach their contract by offering Cannelton Coal through a substitution clause is a *non sequitur*. The commonality of substitution clauses does not mean that Defendants did not breach the contract when their offer reserves the right to substitute coal from the very mine from which they had a separate obligation not to offer to supply that coal. Nor does the general commonality of substitution clauses imply that they are common in the scenario where the coal contemplated in the substitution clause is the subject of an exclusive agreement.

The fact that Defendants actually sold LaFarge Cannelton Coal is undisputed.[15] Under our reading of the Cannelton Contract, the arrangements that led to Cannelton Coal being purchased by LaFarge for use at the Joppa facility could constitute an offer to sell Cannelton Coal, and thus constitute a breach of contract.

### 2. The March of 1994 Bid

A separate issue concerns whether Defendants breached the Cannelton Contract by submitting their March 11, 1994 bid. The March coal proposal explicitly identified the producer as "Cyprus Kanawha Corporation [*i.e.*, Armstrong Coal] and/or Cannelton Industries, Inc. [*i.e.*, Cannelton Coal]," and it identified the location as "milepost 84.3 and/or 87.3," the former of which correlates with Cannelton Coal. J.A. at 293. If this bid was an offer to supply Cannelton Coal to the Joppa facility, as a reasonable jury could find, this clearly constituted a presentation of Cannelton Coal.[16]

Yet Defendants contend, as the district court found, that even if their bid in March of 1994 would have breached the Cannelton Contract, they are nevertheless not liable because Plaintiff waived its rights under the Cannelton Contract by not submitting a bid in March of 1994 to supply

---

[15] Defendants argue that it is significant that, according to their records, approximately two-thirds of the coal supplied to the Joppa facility was Armstrong Coal. This fact, however, fails to shield Defendants from liability as a matter of law for the substantial portion of Cannelton Coal that they sold to LaFarge for use at the Joppa facility.

[16] Defendants argue that this bid proposal did not violate the Cannelton Contract because it offered to fulfill all of LaFarge's 1994 coal requirements, not merely those of the Joppa facility. A reasonable jury could reject this argument. Nothing in Defendants' offer prevented them from supplying Cannelton Coal to the Joppa facility. Furthermore, notwithstanding Defendants' cover letter stating that their bid was "to fulfill Lafarge Corporation's 1994 coal requirements," J.A. at 292, their coal proposal has the words "Joppa, Il" inscribed across the top.

the Joppa facility for the remainder of the year. "That one may waive [contractual] rights is not open to debate." *Eaton v. Trautwein*, 155 S.W.2d 474, 477 (Ky. Ct. App. 1941). The Kentucy Supreme Court, in discussing whether a party waived its rights under an insurance agreement, opined that "[w]aiver . . . is 'bottomed on a voluntary and intentional relinquishment of a known, existing right or power under the terms of an insurance contract.'" *Howard v. Motorists Mut. Ins. Co.*, 955 S.W.2d 525, 526 (Ky. 1997) (quoting *Edmondson v. Pennsylvania Nat'l Mut. Casualty Ins. Co.*, 781 S.W.2d 753, 755 (Ky. 1989)) (holding that the insurance company did not waive its right to refuse to renew the lapsed policy of a former insured by cashing a check from the insured which was refunded shortly thereafter); *accord Garmeada Coal Co. v. Int'l Union of United Mine Workers of Am.*, 122 F. Supp. 512, 516 (E.D. Ky. 1954) (holding that waiver "may be expressed formally or it may be implied as a necessary consequence of the waiver's conduct inconsistent with an assertion of retention of the right"), *aff'd*, 230 F.2d 945 (6th Cir. 1956).

We hold that Plaintiff's failure to make a bid during the solicited bid process does not imply a voluntary and intentional relinquishment of its rights under the Cannelton Contract as a matter of law. Clearly, Plaintiff did not expressly waive its rights under the Cannelton Contract. Nor, in our opinion, did Plaintiff's failure to bid in March of 1994 necessarily constitute an implied waiver. Plaintiff's November of 1993 bid contained an alternative offer to supply the Joppa facility for the remainder of 1994. Plaintiff may have wanted its prior offer to serve as a basis of negotiations for supplying coal to the Joppa facility for the remainder of 1994. Nothing required LaFarge to procure coal through its bid process, and Plaintiff might have hoped that LaFarge would open negotiations with Plaintiff (perhaps using Plaintiff's November of 1993 bid as a starting point) instead of

accepting any of the offers that bidders submitted to LaFarge. Certainly, the prospect of this occurring was greater if Plaintiff's rival could not offer to supply Cannelton Coal.

Additionally, as a factual matter, it is unclear whether Plaintiff received a solicitation from LaFarge to bid to supply coal to the Joppa facility for the remainder of 1994. At his deposition, LeMaster, of Plaintiff, claimed that even though LaFarge promised to send him offers to bid for LaFarge's other locations, LeMaster never received an offer to bid. This testimony is ambiguous as to whether LaMaster ever received a solicitation to submit a bid in March of 1994, and neither the parties nor the record resolve this ambiguity. If Plaintiff never received a bid solicitation from LaFarge, it cannot be contended that Plaintiff waived its rights under the Cannelton Contract by failing to bid.

**D.     Intentional Interference With Prospective Contractual Relation**

Plaintiff also contends that the district court improperly granted summary judgment in favor of Defendants on its intentional interference with prospective contractual relation claim. Kentucky follows the Restatement (Second) of Torts ("Restatement"), see *Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857 (Ky. 1988), § 766B of which provides that "[o]ne who intentionally and improperly interferes with another's prospective contractual relation . . . is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation . . . ."[17]

---

[17] In determining whether interference is improper, a Kentucky court will consider the seven factors outlined in the Restatement § 767:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of

Restatement § 766B (defining tort of "Intentional Interference With Prospective Contractual Relation").

Interference cases in Kentucky "have turned almost entirely upon the defendant's motive or purpose, and the means by which he has sought to accomplish it," which are factors that courts analyze to determine whether the defendant's conduct was "intentional and improper." *Hornung*, 754 S.W.2d at 859 (quoting Prosser and Keeton on Torts § 130 (5th ed. 1984)). A court must consider whether the interference "is malicious or without justification, or is accomplished by some unlawful means such as fraud, deceit, or coercion." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 487 (Ky. 1991). The key question is whether the defendant has a valid reason for taking the challenged action; if the defendant had a legitimate reason for doing what he did, the simultaneous existence of an improper motive, such as spite or a desire to cause the plaintiff harm, will not generally result in the defendant's liability. *Hornung*, 754 S.W.2d at 859 (quoting Prosser and Keeton, *supra* § 130).

"[S]imply attempting to advance one's own legitimate economic interests at the expense of another's interests does not constitute malice." *ATC Distrib. Group, Inc. v. Whatever It Takes Transmissions & Parts, Inc.*, 402 F.3d 700, 717 (6th Cir. 2005) (applying Kentucky law); *see Cullen v. S. E. Coal Co.*, 685 S.W.2d 187, 190 (Ky. Ct. App. 1984) (holding that a company did not intentionally interfere with a doctor's prospective contractual relations where it told its employees that it would not accept bills from the doctor after the doctor billed the company for services not rendered); *Brooks v. Patterson*, 29 S.W.2d 26, 29 (Ky. 1930) ("[T]he basic principle upon which

the actor's conduct to the interference and (g) the relations between the parties.

[Kentucky cases denying liability for tortious interference with contract] rested was that the acts complained of were the outgrowth of competition in business . . . if the injury had been brought about by the exercise of either fraud or force, a different case would have been presented."). In this context, "malice" can consist of bad faith, deception, or wrongful acts without legal justification or excuse. *Patterson*, 234 S.W.2d at 27.

Turning to the facts of the case, we hold that the district court properly granted summary judgment in favor of Defendants on Plaintiff's intentional interference with prospective contractual relation claim. Defendants and Plaintiff were competing coal suppliers who each had an interest in supplying coal to LaFarge. Nothing in the Cannelton Contract prevented Defendants from seeking to advance their own economic interest by selling Armstrong Coal to LaFarge. Additionally, Plaintiff has produced no evidence that Cannelton raised its prices to Plaintiff in order to prevent Plaintiff from successfully competing with Defendants, or otherwise engaged in conduct that constituted malice causing Plaintiff to lose the contract with LaFarge.[18] Plaintiff has failed to carry its burden of showing malice or significantly wrongful conduct.[19] *Cf. Harrodsburg Indus.*

---

[18] Plaintiff's primary evidence of Defendants' intent to interfere with their prospective contractual relations by raising prices is a statement from Nancy Arritt, of Defendants, who wrote to Cannelton that "if you don't want to do business with [Plaintiff], you might want to raise the price some." J.A. at 387. This evidence is unavailing because Plaintiff admits that Cannelton did not change the price it quoted Plaintiff in response to this statement.

[19] Plaintiff, relying primarily on dicta from the Georgia Court of Appeals, claims that Defendants' use of confidential information establishes malice or wrongful conduct. *See Sommers Co. v. Moore*, 621 S.E.2d 789, 791 (Ga. Ct. App. 2005). Plaintiff's theory proceeds as follows: Cannelton, because it was going to provide Plaintiff with a price at which it would sell coal to Plaintiff, had access to Plaintiff's "confidential pricing information." Because Cannelton sent a draft of the bid to Defendants before it sent the bid to Plaintiff, a jury could infer that Defendants used that information when submitting their bid to LaFarge. This, Plaintiff contends, establishes the requisite

*Warehoursing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 534 (Ky. Ct. App. 2005) (holding that the

plaintiff bears the burden of alleging facts from which malice or wrongful conduct can be inferred).

**CONCLUSION**

For the foregoing reasons, we **AFFIRM** in part, **REVERSE** in part, and **REMAND** for

further proceedings consistent with this opinion.

---

malicious motive.  This argument suffers a fatal flaw.  As the district court pointed out, Plaintiff did not receive the price quote from Cannelton until December 3, 1993–after Plaintiff had submitted its bid to LaFarge.  This fact defeats Plaintiff's theory because, even assuming that the bid constituted confidential information that Defendants misused, there is no causal link between the "confidential information" and Plaintiff's bid.

SUTTON, J., concurring in part and concurring in the judgment in part. Judge Clay does an effective job cleaning up a messy case. I agree with him that Excel Energy's intentional-interference-with-prospective-contractual-relations claim fails as a matter of law. I agree with the court's description of the standard for ascertaining whether a district court has improperly granted summary judgment *sua sponte*. And I agree with the court's application of that standard to Excel Energy's claim that Cannelton Sales violated the implied covenant of good faith and fair dealing.

I part company on just one issue—the application of that standard to the breach-of-contract claim. For many of the same reasons that the court holds that the trial court jumped the gun in ruling on the good-faith-and-fair-dealing claim, I would hold that the same is true with respect to the contract claim. The main dispute joined by the parties below was whether the Cyprus defendants were liable (as successors-in-interest) for Cannelton's alleged breach of its contract with Excel Energy—not whether there was a contractual breach. Yet the district court not only chose not to resolve the successor-in-interest issue but also embraced a theory for concluding that the contractual claim was defective that the parties never briefed—the meaning of the "presentation" clause. I see no good reason to decide that difficult question on an incomplete record—incomplete because the parties had no reason to anticipate that this reading of the contract was in play, no incentive to argue the merits of this interpretation and no obligation to come forward with other evidence of the parties' intent about the meaning of this clause. Were we to remand this aspect of the case, the parties would have an opportunity to fill these gaps in the record or an opportunity to sidestep the question altogether by obtaining a ruling from the district court about whether any of this matters—which it would not if the Cyprus defendants did not inherit Cannelton's legal problems.